# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### SEPTEMBER 17, 2001 Session
# WRIGHT MEDICAL TECHNOLOGY, INC.
### v.
# BERNARD GRISONI and BIOGENERATION, INC.

**Appeal from the Chancery Court for Shelby County**
**No. 98-0285-1      Walter L. Evans, Chancellor**

---

**No. W2000-01302-COA-R7-CV  -  Filed December 18, 2001**

---

This case involves the alleged use of confidential information by an ex-employee. The defendant employee worked for the plaintiff employer developing a medical product. The employee signed an agreement prohibiting the use of confidential information after his employment ended, but did not sign a non-competition agreement. The employee was terminated and thereafter began manufacturing a competing medical product. The plaintiff employer sued and obtained a temporary injunction prohibiting the ex-employee from manufacturing the product. The trial court later dissolved the injunction. Subsequently, it found the defendant employer liable for malicious prosecution and punitive damages, awarding damages of over $9 million. The employer appeals. We affirm in part, reverse in part and modify. We reverse the finding of malicious prosecution, holding that the evidence is insufficient to establish malice or lack of probable cause. We also reverse the award of punitive damages. We affirm the trial court's dissolution of the injunction against the former employee, and find that the compensatory damages are limited by the amount of the injunction bond. Consequently, the award of compensatory damages is modified to this amount.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part and Modified.**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID FARMER, J., joined.

Leo Bearman, Jr., George T. Lewis, III, and Marianne B. Matthews, Memphis, Tennessee, for the plaintiff/appellant, Wright Medical Technology, Inc.

Ronald D. Krelstein, Germantown, Tennessee, and Steven M. Markowitz, Memphis, Tennessee, for the defendant/appellees, Bernard F. Grisoni, and Biogeneration, Inc.

Michael I. Less and Ted M. Hayden, Memphis, Tennessee, for the appellee, Travelers Casualty and Surety Company of America.

Lucian T. Pera and W. Bryan Smith, Memphis, Tennessee, submitting Amicus Curiae Brief for William H. Haltom, Jr.

**OPINION**

This case involves the alleged use of confidential information by an ex-employee. Plaintiff/Appellant Wright Medical Technology, Inc. (Wright), is a Memphis corporation which develops and markets medical products. Defendant/Appellee Bernard Grisoni ("Grisoni") is a former employee of Wright, and Defendant/Appellee Biogeneration, Inc. ("Biogeneration") is the company Grisoni started after his employment with Wright was terminated.

**FACTS AND PROCEEDINGS**

Grisoni was hired by Wright in February 1994 as manager of silicone materials and process research. Grisoni holds a bachelor's degree in material science, master's degrees in polymer technology and business administration, and a Ph.D. in manufacturing engineering. Grisoni began working in the field of manufacturing medical devices in 1985. Before coming to Wright, Grisoni worked with silicone materials at Dow Corning. Immediately before joining Wright, Grisoni was the project manager for the development of interocular lenses at Allergan Medical Optics.

When Grisoni became employed at Wright, he was required to sign a confidentiality agreement. The agreement read, in pertinent part:

> Other than as required in my duties as an employee of Wright Medical Technology, I will not disclose to anyone or use either during or after my employment; except with the prior written consent of Wright Medical Technology, any trade secret, confidential know-how or confidential business or technical information of Wright Medical Technology. The foregoing obligation shall also apply to any trade secrets or other confidential information of any third party learned by me as a Wright Medical Technology employee and which Wright Medical Technology has an obligation to maintain in secrecy. The obligations of secrecy and non-use of this paragraph shall not apply to any information which has become publicly available through no fault of my own.

Thus, the confidentiality agreement prohibited Grisoni from using or disclosing any confidential information of Wright that had not become publicly available. However, it did not include a non-competition clause prohibiting Grisoni from developing a competing product after leaving his employment with Wright.

In 1994, Wright began developing calcium sulfate bone void fillers, and soon thereafter it became one of Wright's major priorities. Bone void filler is a material used by an orthopedic surgeon to fill a cavity appearing in a patient's bone, resulting from either traumatic injury or the surgical removal of diseased or infected bone matter. The bone void filler material is grafted over the area of missing bone or void until the area is replenished by the body's own natural bone formation. Use of a bone void filler decreases the risk of infection and harmful scar tissue while the natural bone regenerates. Traditionally, surgeons have transplanted bone matter from other parts of

the patient's body, such as the patient's ribs, or implanted pieces of bone from a bone bank. Synthetic materials have also been used with varying degrees of success. Calcium sulfate has been used as an artificial bone void filler for at least a century. The advantage of calcium sulfate is that it is absorbed into the body, that is, it dissolves, at roughly the same rate as the new bone growth. This allows for the cavity to remain filled while the new bone forms directly behind the calcium sulfate filler material.

Wright experimented with several methods of calcium sulfate bone graft production. Calcium sulfate dihydrate, also known as gypsum, is a natural occurring compound which is mined and processed. The resulting powder can be used in both food and pharmaceutical production. Under the "pressed" method of bone void filler production, a small amount of stearic acid is added as a binding agent to the calcium sulfate dihydrate powder. The mixture is then compressed into small tablets or pellets to be surgically grafted into the bone cavity. A second method of bone void filler production involves the removal of water from the calcium sulfate dihydrate, thereby creating calcium sulfate hemihydrate. This can be done by simply heating the compound in order to remove the water, forming beta-type hemihydrate, or by a combination of heat and pressure to crystalize the hemihydrate, forming alfa-type hemihydrate. Regardless of which type of hemihydrate is produced, the calcium sulfate is then combined with a fixed amount of water. This results in a dihydrate in paste form. This paste can then be directly implanted into the bone cavity to solidify, or the paste can be first molded into small pellets, dried, and then surgically implanted at a later time.

Wright and other companies had tried to develop a number of calcium sulfate bone void fillers, but neither Wright nor any of Wright's competitors had gained the necessary FDA approval for the products. FDA approval was essential to developing a commercially viable product. In 1976, Congress amended the Federal Food, Drug and Cosmetic Act, 21 U.S.C.S. §§ 301 et seq. (1984) ("the Act."). The amendments to the Act require FDA clearance before a medical device can be marketed in the United States. The amendments did not cover products which existed in interstate commerce prior to May 23, 1976. New medical devices developed after that date were required to meet certain performance standards established by the FDA. To demonstrate that a product is effective and safe for use for humans, and thus obtain FDA approval, extensive animal and human clinical studies are often required.

The Act allows for clearance of a medical product through an application process whereby the submitting company demonstrates to the FDA that the non-approved device is "substantially equivalent" to a predicate device, either a pre-1976 product or a product which has already been given FDA clearance. This "piggybacking" approval process permits the submitting company to obtain FDA clearance for a medical product without having to engage in the lengthy animal and human clinical studies that would otherwise be necessary. The FDA exercises a great deal of discretion in determining whether a product will be approved as "substantially equivalent" to a predicate product. If the application, known as a 510(k), fails to meet FDA approval, the FDA will usually provide feedback informing the company of the factors it considered in concluding that the two compared products were not "substantially equivalent." The submitting company then has several options to obtain clearance. The company can modify its product to more closely mimic the

predicate device, or find a predicate device more similar to its product and resubmit the 510(k) application. If the company's product is not modified or a new predicate product is not found, the company could use an alternate method of demonstrating "substantial equivalency," such as by using more extensive forms of testing or comparing different variables. If FDA approval is not obtained by one of these means, the company would likely be forced to engage in extensive animal and human clinical studies to obtain approval.

Once FDA clearance is given, the FDA provides the public limited access to the submitting company's 510(k) application by placing a summary of it on the FDA's website. Information not included in the FDA summary is normally kept confidential.

Within a few months of beginning his employment with Wright, Grisoni was given responsibility over Wright's calcium sulfate bone void filler project. He worked on this project for the duration of his employment at Wright. Prior to joining Wright, Grisoni had no experience in the area of calcium sulfate bone void filler products and had reviewed no literature on such products. Once Grisoni was given the responsibility for developing these products, he researched a variety of publicly available sources on uses of calcium sulfate bone grafts.

In working on the calcium sulfate bone filler project, Grisoni worked closely with Dr. Warren Haggard ("Haggard"), also employed by Wright. Haggard holds a Ph.D. in biomedical engineering and is an expert in biomaterials. Haggard had worked for Wright since August 1993. Grisoni also worked with Robert Churinetz ("Churinetz"), who was the Wright official responsible for quality assurance and regulatory approval. Grisoni worked with Churinetz on obtaining FDA approval for Wright's bone void filler. Obtaining FDA approval for Wright's bone void filler proved to be a lengthy and difficult process.

To get the raw materials for the bone void filler, Wright entered into a licensing agreement with U.S. Gypsum ("USG"). The agreement with USG also enabled Wright to gain access to USG's expertise in calcium sulfate bone void fillers. USG was one of the largest producers of calcium sulfate and had been engaged with other companies in extensive research into the use of calcium sulfate as a bone void filler.

While overseeing this project for Wright, Grisoni met with several individuals who were instrumental in the development of calcium sulfate bone void fillers. On one occasion in April 1995, Grisoni met with Max Sherman, a former employee of Zimmer, another company that manufactured orthopedic devices. While at Zimmer, Sherman had been in charge of regulatory affairs. Sherman provided Wright a bibliography developed at Zimmer containing several articles on the production and use of calcium sulfate bone void fillers, which Grisoni used to do background research. According to Sherman, Zimmer had tried to develop a calcium sulfate bone void filler but was unsuccessful in getting its 510(k) application approved by the FDA, primarily because Zimmer had used actual bone as the predicate device for its bone void filler in the 510(k) application. Sherman felt that a better predicate device for FDA approval would be Ethicon, a calcium sulfate bone filler device in pellet form which had been marketed unsuccessfully in the 1950s and 1960s. After

production of Ethicon was ceased, the remaining supply of Ethicon pellets were given to Dr. Leonard Peltier, who supported the development of Ethicon.

In light of Sherman's comments, Wright made a decision to use Ethicon as the predicate device in the 510(k) application for FDA approval of its bone void filler. Wright's initial bone void filler was an antibiotic loaded calcium sulfate product in pellet form. However, by mid-1995, Wright's major effort was a kit, called Osteoset, which contained calcium sulfate hemihydrate powder, a vial of liquid, a mixing bowl and a mixing tool. The surgeon would mix the contents of the kit into a calcium sulfate paste and then graft the paste into the bone cavity, where it would then solidify. In September 1995, Wright's 510(k) application on the Osteoset kit was submitted to the FDA. The FDA denied approval of the 510(k) application, citing the technological differences between implanted pellets such as Ethicon and the direct application of a calcium sulfate paste.[1] In denying approval for the 510(k) application, the FDA also noted that Wright had not demonstrated that Ethicon was sold in interstate commerce prior to March 1976.

After this initial failure, Wright determined that its bone void filler needed to be in the form of calcium sulfate pellets, similar to Ethicon, in order to obtain FDA approval. In order to develop such a product, Wright obtained a single package of Ethicon pellets from Dr. Peltier. Wright then began consulting with Dr. Peltier on the development of Wright's own calcium sulfate pellets.

Once Wright had access to Ethicon pellets, Wright employees began to "reverse engineer" calcium sulfate pellets which closely proximated Ethicon pellets. In January 1996, Wright opened the single package of Ethicon pellets and sent the contents to USG for chemical analysis. Within a few weeks after acquiring the Ethicon pellets from Dr. Peltier, Wright had created the prototype of its Osteoset pressed pellets, containing 98% calcium sulfate dihydrate and 2% stearic acid.

In order to gain FDA approval, Wright needed to demonstrate that the Osteoset pellets would perform similarly to Ethicon pellets when implanted into the human body. Since Ethicon's dissolution inside the human body had previously proven successful, Churinetz proposed to conduct dissolution tests of the two products inside the laboratory. Churinetz and Grisoni conducted the comparison by using water and phosphate buffered saline solution as the dissolution mediums. By establishing that the two products, Osteoset and Ethicon, had similar dissolution rates in water, which has less density than body fluids, and phosphate buffered saline solution, which has a density greater than body fluids, Churinetz hoped to demonstrate to the FDA that the dissolution rates for both Osteoset and Ethicon would correlate with the rate of new bone growth when implanted in the human body. In February 1996, Wright conducted the dissolution tests and verified that Osteoset had similar dissolution rates to Ethicon.

---

[1] Subsequently, in March 1997, Wright received FDA clearance on the Osteoset plaster kit. However, the approved kit required the surgeon to first mold and dry the paste into small pellets before implantation. This device was approved using Osteoset pellets (approved in June 1996) and not Ethicon as the predicate device.

These dissolution tests were then incorporated into Wright's 510(k) application in order to show that the two products had "substantially equivalent" dissolution rates. Affidavits from former Ethicon employees and Dr. Peltier were submitted to show that Ethicon had been marketed in interstate commerce prior to May 1976. In June 1996, Wright's 510(k) application for Osteoset was approved by the FDA. Two months later, Wright began marketing Osteoset to the public. In July 1996, the summary of Wright's 510(k) application was made available on the FDA's website.

After Wright obtained FDA clearance for Osteoset, it switched to a casting process for producing Osteoset pellets. The process required that Wright first convert the dihydrate powder supplied by USG into hemihydrate powder. Water could then be added to form a dihydrate paste. Wright had previously learned from USG that either the alpha-type hemihydrate or beta-type hemihydrate could be used to produce calcium sulfate paste.[2] Wright opted to use alpha-type hemihydrate in its molding process.

Wright produced alpha-type hemihydrate crystals using a calcination process involving heat and pressure. USG had previously developed temperature and pressure ranges for the calcination process, and Wright acquired this information as part of its agreement with USG. After the calcination process was completed, the hemihydrate powder was mixed with stearic acid and water to create a calcium sulfate dihydrate paste. This paste could then be mass molded and dried into pellets similar in size and composition to the pressed pellets. However, Wright discovered that the dissolution rate of the cast pellets was different than the dissolution rate of the pressed pellets. By decreasing the amount of stearic acid in the mixture of the cast pellets, Wright achieved a dissolution rate equivalent to that of the pressed pellets.

Metal molds were originally used to mold the Osteoset pellets. However, to allow the pellets to expand during drying, Grisoni designed a flexible silicon mold. The pellets were bottled and then underwent a sterilization process using gamma radiation. Once the sterilization was completed, the pellets were packaged and stored for distribution.

In August 1997, Wright implemented a company-wide reduction in force in which approximately 75 employees were terminated. As part of the reduction in force, on August 19, 1997, Grisoni's employment with Wright was terminated. Within a few days of his termination, Grisoni decided to start his own business dealing in tissue repair, which he called Biogeneration, Inc. Grisoni's experience at Wright, as well as several articles appearing in Memphis newspapers, made him aware of the growing market in calcium sulfate bone substitutes. Grisoni chose to manufacture calcium sulfate bone filler because such filler can be manufactured without a large amount of start-up capital. Grisoni later testified that he went to area libraries to review books and articles on calcium sulfate. Many of these articles were listed in the bibliography of Wright's technical monograph for Osteoset, published and distributed as part of Osteoset's marketing campaign.

---

[2]Grisoni had conducted a dissolution test in 1995 comparing the dissolution rates of alpha-type hemihydrate and beta-type hemihydrate and concluded that the two had equivalent dissolution rates.

Grisoni later testified that he accessed the FDA web page to review Wright's 510(k) summaries to Osteoset products.

After Grisoni's initial research, he began working on a competing bone void filler using beta-type calcium sulfate hemihydrate. By September 8, 1997, less than three weeks after his termination, Grisoni had designed a prototype of his competing bone filler, which contained 98% calcium sulfate dihydrate and 2% stearic acid and was in pellet form, similar to Osteoset. On September 26, 1997, a little over a month after his termination, Grisoni submitted to the FDA a 510(k) application on his product, called ProFusion, using Osteoset as his predicate device. In his application, Grisoni described ProFusion as being "identical" to Osteoset. Also included in the 510(k) application for ProFusion were the results of dissolution studies comparing the dissolution rates of ProFusion with those of Osteoset. The studies were conducted using the same test fluids, water and phosphate buffered saline solution, as Grisoni had used previously for Wright's dissolution studies in its 510(k) application for Osteoset. Grisoni ran his test for the same number of days, eight, and used the same amount of water, 100 millileters, as was used in conducting the Wright dissolution studies. In this manner, Grisoni was able to demonstrate to the FDA that the dissolution rates of ProFusion and Osteoset were "substantially equivalent." In April 1998, the FDA approved Grisoni's 510(k) application for ProFusion.

Meanwhile, after Grisoni was terminated, Wright began having technical problems with its antibiotic loaded bone void filler process. Consequently, not long after Grisoni was terminated, Wright asked Grisoni to return to Wright as a consultant for a limited period of time, from September 29 to October 31, 1997. On September 29, 1997, Grisoni's first day back as a consultant, Grisoni told Haggard that he was involved in developing a bone graft substitute. The next day, Grisoni met with the vice president and general counsel of Wright, Tom Patton ("Patton"), and discussed his involvement in producing a competing bone filler product. Patton reminded Grisoni of his obligations under the confidentiality agreement. Grisoni assured Patton that he was honoring the agreement.

Grisoni later testified that, while working as a consultant at Wright, Grisoni would take his ProFusion lab notebook with him, keeping it in his briefcase. He said that he took the notebook with him to Wright so that he could write down ideas. Grisoni's briefcase did not have a lock. On several occasions, Grisoni left his briefcase unattended at his desk while working in the lab or attending meetings. Grisoni's desk was located close to Haggard's office. Haggard did not attend the majority of the meetings Grisoni attended during this time.

After Grisoni's meeting with Patton regarding Grisoni's obligations under the confidentiality agreement, Patton remained concerned with the possible conflict of having Grisoni consult with Wright while Grisoni continued to develop a competing bone filler device. As a consequence, on October 8, 1997, Wright terminated Grisoni's services as a consultant. At that time, Wright had Grisoni sign a consulting agreement which, similar to the earlier confidentiality agreement, prohibited Grisoni from using or disclosing any confidential information he received from Wright

pursuant to the consulting agreement.[3]  Thereafter, Grisoni received a letter from Patton dated October 6 1997, informing him what Patton believed to be included within the confidentiality agreement, including the production process and regulatory strategy for Osteoset.[4]  Grisoni's attorney, Fred Acuff, sent a letter to Patton denying that Grisoni had used any confidential information and offered to meet with Patton to discuss any alleged violations of the confidentiality agreement.  Instead of meeting with Acuff, Patton sent a letter to Acuff stating that "whether this matter is put to rest or not is up to your client."

In early March 1998, Grisoni attended the annual meeting of the American Academy of Orthopedic Surgeons in New Orleans.  During the meeting, Grisoni exhibited ProFusion and offered brochures and other information to those in attendance.  Wright also had a booth at the annual meeting and saw that Grisoni was producing his own calcium sulfate bone void filler.  When Patton, who by then was Wright's president, learned that Grisoni was marketing a competing product, he instructed Wright's general counsel, Michael McLaren, to investigate the matter.  McLaren was an experienced attorney and a partner in the Memphis law firm of Thomason, Hendrix, Harvey, Johnson and Mitchell ("Thomason Hendrix"), as well as Wright's general counsel.  McLaren reviewed Grisoni's confidentiality agreement and talked to several Wright officials, including Haggard and Churinetz.  After the investigation, McLaren advised Wright to retain the Thomason Hendrix law firm to seek injunctive relief against Grisoni.  Attorneys William Haltom and Robert Moore of the Thomason Hendrix firm were assigned to represent Wright in the matter.

On March 23, 1998, Grisoni sent a letter to Patton offering to meet with Wright officials to discuss any alleged violations of the confidentiality agreement.  Grisoni and Acuff later met with Wright's attorneys to discuss possible resolution of the matter.  The meeting was verbally combative and resulted in no resolution.

On March 31, 1998, Wright filed an action in Shelby County Chancery Court, seeking injunctive relief against Grisoni and his company, BioGeneration.  The lawsuit asserted that Grisoni had violated his confidentiality agreement by using Wright's confidential information to develop ProFusion.  In the complaint, Wright sought injunctive relief prohibiting the use or disclosure of any confidential information or trade secrets and asked the trial court to enjoin Grisoni from

_____

[3] Like the original confidentiality agreement, the consulting agreement provided an exception for information which was or became publicly available.  While the agreement prohibited the use or disclosure of any confidential information, it acknowledged Grisoni's participation in developing a competing calcium sulfate bone void filler.  The agreement provides "WMT hereby acknowledges and approves that you are currently and will continue to be engaged individually and with another corporation in the field."

[4] The letter provides that "confidential information would include the production process for creating the OSTEOSET® hemi-hydrate alpha crystals.  Also confidential is such non-public information as the 510(k) for OSTEOSET, the company's regulatory strategy for OSTEOSET, the dissolution curve for each of the OSTEOSET products, how to attain such curves, the ability to vary the curves, the type and the source of the raw material for the original OSTEOSET, the difference and similarities between the original and subsequent OSTEOSET products, and the process for creating OSTEOSET...."

manufacturing and marketing ProFusion. The trial judge, Chancellor Neal Small, immediately issued a temporary restraining order (TRO) prohibiting any further violations of the confidentiality agreement. The TRO prohibited the use of confidential information and trade secrets but did not enjoin Grisoni from manufacturing and marketing ProFusion, so long as no confidential information or trade secrets were utilized. A temporary injunction hearing was set for April 13, 1998, and Wright was ordered to post a $500 bond. On April 6, 1998, attorney Stephen Biller entered a Notice of Appearance on behalf of Grisoni.

On the date of the scheduled hearing, both parties were conducting extensive discovery. Consequently, the parties consented to an order modifying and extending the TRO until April 27, 1998. Unlike the original TRO, the modified TRO prohibited Grisoni from manufacturing or marketing ProFusion or from transferring his interest in ProFusion or his approved 510(k) application.[5]

On April 23, 1998, Grisoni filed his answer, including a jury demand. At a meeting on the morning of the scheduled hearing on April 27, Biller told Grisoni that he felt that Grisoni should not oppose Wright's request for a temporary injunction order pending a hearing on the merits. Thereafter, Biller contacted the attorney for Wright and told him that Grisoni would not oppose the temporary injunction order. The attorneys for both parties made alternate proposals regarding the wording of the order. The temporary injunction order that was finally entered contained the same language as the modified TRO, prohibiting the manufacture and marketing of ProFusion.[6] The temporary injunction order also increased the injunction bond to $7500. Travelers Casualty and Surety Company (Travelers) was the surety under the bond. While Biller, on behalf of Grisoni, consented to the temporary injunction, Biller and Grisoni maintained that Grisoni had used no confidential information. Thereafter, the parties continued discovery, including Grisoni's deposition. In his deposition, Grisoni asserted that ProFusion was substantially different from Osteoset.

On June 3, 1998, Grisoni and Biller attended a settlement conference at the law offices of Thomason Hendrix. Attorney William Haltom represented Wright at the settlement conference. Unbeknownst to the attorneys, Grisoni secretly tape recorded the settlement conference. During the meeting, Haltom asserted that Grisoni's testimony in his deposition, that ProFusion was altogether different than Osteoset, was inconsistent with the prior claim made in his 510(k) application that the two products were "identical."[7] Haltom said that, unless Grisoni agreed to surrender his 510(k) on ProFusion, Wright intended to go to both the chancery court and the FDA and inform them of Grisoni's contradictory statements.

---

[5] Grisoni alleges that he did not agree to these additional terms in the modified TRO.

[6] Grisoni asserts that he did not agree to this language and did not even see the temporary injunction order until sometime in June.

[7] In September 1998, in response to these allegations Grisoni submitted a letter to the FDA explaining that he intended the term "identical" to mean "essentially alike" or "substantially equivalent."

By September 1998, the relationship between Biller and Grisoni had deteriorated and a consent order was entered substituting Steven Markowitz as the attorney for Grisoni. On November 23, 1998, Grisoni filed a motion to dissolve or modify the temporary injunction, asserting that (1) he had never consented to the language in the temporary injunction order dealing specifically with ProFusion and (2) he had not violated the confidentiality agreement.

The hearing on Grisoni's motion to dissolve the injunction was held on January 26, 1999. At the outset, Wright's attorney assumed that the only issue the trial court planned to consider was whether Grisoni had consented to the temporary injunction; consequently, he assumed that Grisoni would have the burden of showing lack of consent to the injunction. However, the trial judge, Chancellor Walter Evans,[8] decided that, since no evidence had ever been presented on whether Wright was entitled to a temporary injunction, the hearing on dissolving the temporary injunction would be consolidated with the hearing on Wright's request for a permanent injunction.[9] Accordingly, over Wright's objection, the burden of proof was assigned to Wright. Grisoni did not object to proceeding on Wright's request for a permanent injunction, despite having originally demanded a jury trial.

At the outset of the hearing, Grisoni objected to the amount of the injunction bond, which was, at the time, $7,500. Grisoni noted that the injunction would cause him to miss the Annual Meeting of the American Academy of Orthopedic Surgeons, the premier event for marketing a product such as ProFusion. In light of this, the trial judge increased the amount of the injunction bond from $7,500 to $250,000. On February 1, 1999, Travelers issued a rider to the original injunction bond increasing the penal sum to $250,000.

Testimony was heard over a six week period. Wright first presented testimony from attorney Biller that Grisoni had in fact consented to the temporary injunction. After Biller's testimony, the trial court decided that the hearing should be on Wright's request for a permanent injunction. Wright was then obliged to present evidence showing that Grisoni had, in fact, violated his confidentiality agreement with Wright during the course of Grisoni's development of a competing bone void filler. The evidence presented by Wright included evidence of the following:(1) Grisoni had no experience with calcium sulfate bone void fillers before coming to Wright; (2) while with Wright, Grisoni was placed in charge of Wright's calcium sulfate bone void filler project; (3) while overseeing the project, Grisoni was given access to a variety of technical sources of information that Wright considered confidential, including information from USG that either alpha-type or beta-type hemihydrate could be used in producing bone void fillers; (4) by trial and error, and at substantial time and investment, Wright was able to develop Osteoset, get regulatory approval, and bring Osteoset to the market; (5) after being terminated from Wright, Grisoni was able to develop a

---

[8] During the interim, Chancellor Small's bid for re-election was defeated and Chancellor Evans was elected.

[9] Rule 65.04(7) of the Tennessee Rules of Civil Procedure provides: "Before or after the commencement of the hearing of an application for a preliminary injunction, the Court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application."

competing bone void filler within a matter of weeks; and (6) Grisoni was able to get FDA approval by showing that his competing bone void filler was "substantially equivalent" to Osteoset.

For each piece of information or technical know-how Wright asserted to be confidential, Grisoni sought to show either that the information was publicly available, and therefore outside the scope of the confidentiality agreement, or that Grisoni's process was different from the processes he learned while at Wright. Grisoni testified extensively about the independent research he did after his termination on calcium sulfate and the FDA approval process. Grisoni also testified extensively on the differences between ProFusion and Osteoset in composition, production processes, and testing.

Grisoni also questioned the credibility of Wright's witnesses. Grisoni noted that Wright had asserted in its complaint that Grisoni had developed his prototype of ProFusion "by" September 8, 1997, a matter of weeks after his termination. Grisoni asserted that he had told no one this date, and that the only place that information appeared was in the lab notebook he brought to Wright in his brief case while working as a consultant. When questioned about this in his testimony, Haggard was unable to say how Wright arrived at September 8, 1997 date in its complaint. The lab notebook was not produced to Wright until discovery was commenced, after Wright's complaint was filed in March 1998.[10] From these facts, Grisoni asserted that Haggard or another employee of Wright must have gained access to Grisoni's briefcase and looked at his lab notebook while he was consulting for Wright in October 1997.

At the hearing to dissolve the injunction, for reasons that are not entirely clear from the record,[11] the attorney for Wright, William Haltom, was subpoenaed to testify. In his testimony, Haltom was questioned at length about the settlement conference with Grisoni at which Haltom told Grisoni that, if Grisoni refused to give up his 510(k) on ProFusion, Wright would go to the chancery court and to the FDA to tell both of Grisoni's contradictory statements on whether ProFusion was "identical" to Osteoset. The questioning and Haltom's testimony were often contentious. Later in the hearing, the tape Grisoni secretly made of the settlement conference was disclosed and played for the trial court, in an effort to show that Haltom had "threatened" Grisoni but would not admit to doing so in his testimony.

---

[10]At the injunction hearing, Wright's counsel, Steve Vescovo, stated: "Do they want to know how we found out? I know, but he can't ask me. That's my business. Okay? But the fact of the matter is we're right on the date. Okay? How we found out about it is my business."

[11]The trial judge questioned Grisoni's attorney about the relevance of Haltom's testimony. Grisoni's attorney, Steve Markovitz, responded that Haltom's testimony was relevant to whether Haltom's law firm should be permitted to continue representing Wright at the trial. Wright's attorney, Steve Vescovo, indicated that Wright did not object to Haltom's testimony because Grisoni's attorney had called into question Haltom's ethics and Wright wished to respond. Haltom's testimony later became relevant to the issue of malicious prosecution for which Grisoni sought damages at the subsequent damages hearing.

After the hearing was concluded, on March 10, 1999, the trial court issued from the bench its findings of facts and conclusions of law. The trial court stated the issue as "whether the defendant used confidential information or trade secrets of the plaintiff which had not become publicly available." The trial court noted that it was very impressed with Grisoni's knowledge, expertise and credibility. The trial court made no findings at that time regarding the credibility of Wright's witnesses or of Wright's attorney, William Haltom. The trial court found, *inter alia*, that any information on which Grisoni relied to develop ProFusion was not confidential but was publicly available. Based on its view of the evidence, and its determinations of credibility, the trial court concluded that ProFusion was developed as a result of Grisoni's ingenuity, hard work and ability, and not as a result of any misappropriation of confidential information or trade secrets of Wright.

After the trial court issued its ruling from the bench, Wright indicated that it intended to file an interlocutory appeal. Wright then sought from the trial court a stay of the trial court's order, pending its interlocutory appeal. The trial judge declined to rule on Wright's motion for a stay. By order dated March 22, 1999, the trial court dissolved the injunction and set a hearing for March 29, 1999 to determine the amount of any damages Grisoni sustained as a result of the wrongfully issued injunction.

Shortly thereafter, on March 24, 1999, Wright filed its motion for interlocutory appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure, as well as a motion under Rule 7 of the appellate rules for a stay of the trial court's order. The appellate court immediately stayed the trial court's order dissolving the injunction, conditioned upon Wright posting an additional $250,000 bond,[12] making a total bond of $500,000. On March 31, the appellate court stayed any further proceedings in the trial court in order to permit the appellate court to address Wright's motion for interlocutory appeal. The earlier order staying dissolution of the injunction also remained in effect.

On May 11, 1999, the appellate court entered an order, holding that the injunction against Grisoni should remain in place until final disposition of the case, and finding that there was nothing further for the appellate court to consider at that time. The appellate court remanded the matter to the trial court for a hearing on damages and entry of final judgment, and noted that the trial court had the authority to determine the adequacy of the bond pending entry of final judgment as well as pending appeal.

Thereafter, on May 19, 1999, Wright filed a petition with the appellate court for a rehearing of the appellate court's denial of Wright's Rule 10 motion for interlocutory appeal. Wright argued that remanding the cause to the trial court for a hearing on damages was inappropriate because Grisoni had never requested damages in any pleading filed with the trial court. On May 24, Grisoni filed a response to Wright's petition to rehear, but did not address the issue of damages.

---

[12]The additional $250,000 bond was posted by Wright, not Travelers.

Meanwhile, on May 26, 1999, Grisoni filed a motion with the trial court to increase the injunction bond to $5 million. Grisoni's motion before the trial court noted that the appellate court had previously required an additional $250,000 bond, which remained in effect, making a total bond at that point of $500,000. Grisoni maintained that the bond in effect at that time was "wholly inadequate."

On June 8, 1999, the appellate court entered an order on Wright's petition for rehearing on its denial of Wright's motion for interlocutory appeal. Since Grisoni's response to the petition had not addressed the issue of damages, the appellate court ordered Grisoni to show cause on whether Grisoni had filed any pleadings with the trial court requesting damages. The June 8 order stated that further proceedings in the trial court were stayed until further order of the appellate court.

On the same date, June 8, 1999, the trial court held a hearing on Grisoni's motion to increase the injunction bond. Without knowledge of the order of the appellate court staying further proceedings, the trial court entered an order requiring Wright to post an additional $1.9 million bond, making a total bond of $2.4 million. The trial court's order stated that the additional bond had to "be posted on or before June 18, 1999, otherwise, the injunction presently in effect, whose dissolution was stayed by the Court of Appeals, is dissolved."

In light of its earlier order staying proceedings in the trial court, on June 17, 1999, the appellate court entered an order vacating the trial court's June 8 order increasing the injunction bond to $2.4 million, finding that the $500,000 bond in effect at that time was "sufficient for present purposes." The appellate court denied Wright's petition to rehear. It noted that the parties agreed that the only remaining issue was damages,[13] and concluded that it was best for the case to proceed to final judgment rather than hearing an interlocutory appeal. The appellate court remanded the case to the trial court and ordered that the injunction against Grisoni should remain in effect. Grisoni then sought permission from the Tennessee Supreme Court for an interlocutory appeal of the Court of Appeals' order setting the injunction bond at its previous level of $500,000. Grisoni's petition with the Tennessee Supreme Court was denied. The injunction bond remained at $500,000 until the conclusion of the trial court's proceedings on the issue of damages.

The hearing on damages commenced on March 6, 2000. Grisoni sought damages under Rule 65 of the Tennessee Rules of Civil Procedure on the theory that the injunction was wrongfully issued, as well as damages for malicious prosecution, damages under the Tennessee penalty statute for wrongful injunctions, Tennessee Code Annotated §29-23-104, and damages for Wright's alleged misappropriation of Grisoni's proprietary information to develop another product called Allomatrix. Grisoni also sought punitive damages and attorney's fees.

---

[13]On July 15, 1999, Grisoni filed a motion with the trial court to amend and supplement his Answer to include an allegation of damages suffered as a result of the wrongfully issued injunction, as well as a request for punitive damages.

At the hearing on damages, Grisoni testified regarding his sales projections for ProFusion, as well as his expected costs and profit margin. Grisoni also presented the testimony of an economic expert, Robert Bush. Bush calculated that potentially Grisoni could have achieved approximately 10 percent of an estimated $500 million to $750 million total annual market for bone filler products. For the period during which the injunction was in place, taking into account the amount of product Grisoni could have produced, Bush estimated that Grisoni could have realized on approximately 10 percent of his sales potential or, roughly, $5.3 million per year.[14]

Grisoni again testified on his assertion that Wright officials accessed the information in his lab notebook during the time in which Grisoni worked as a consultant for Wright. In his testimony, Grisoni said that the fact that his prototype for ProFusion was developed on September 8, 1997 was noted in his lab notebook. Grisoni maintained that the only place this date appeared was in his lab notebook. He had not discussed this date with anyone at Wright. Nevertheless, in its original complaint, Wright alleged that Grisoni developed his prototype "by" September 8. Grisoni alleged that, during the time he was consulting for Wright in October 1997, Haggard accessed Grisoni's briefcase without Grisoni's permission, read through the lab notebook and, thereby, learned the date the prototype was developed.

In support of his claim for malicious prosecution, Grisoni proffered the testimony of Larry Houk, Ph. D., a chemistry professor for nearly 30 years, employed at the time of trial at the University of Memphis. The substance of Houk's testimony was that anyone with a chemistry background would have been able to produce ProFusion using only publicly available information. Houk asserted that this fact would have been obvious to Wright at the time that Wright allegedly reviewed Grisoni's lab notebook.

Grisoni sought compensatory damages for malicious prosecution as well as punitive damages. In response to the allegation of malicious prosecution, Wright offered the testimony of Wright officials and attorneys concerning the reasons why they believed that seeking an injunction was appropriate. Patton testified that he first observed Grisoni's ProFusion product at the annual meeting of the American Academy of Orthopedic Surgeons. The similarities in the two products and the fact that Grisoni was able to develop ProFusion in such a short time convinced Patton that Grisoni had likely used Wright's confidential information to develop ProFusion. Afterward, Patton asked Wright's general counsel, Mike McLaren, to investigate the matter. McLaren testified that he interviewed Haggard and Churinetz and reviewed the work in which Grisoni was involved while employed at Wright, as well as the confidentiality agreements Grisoni had signed. McLaren said that he was familiar with the legal requirements to obtain injunctive relief and felt at the time that injunctive relief was warranted.

Grisoni also sought damages for the alleged misappropriation of information from his lab notebook. Grisoni testified that, in early 1998, he began researching a calcium sulfate putty which

---

[14] Operation costs were estimated at between 20 and 30 percent of total sales, leaving Grisoni with between $310,000 and $350,000 monthly profit.

contained substances to promote bone growth. Grisoni recorded his research on the calcium sulfate putty in his lab notebook. The lab notebook was later turned over to Wright in April 1998 as part of discovery into Grisoni's development of ProFusion. Grisoni testified that lab notes obtained during discovery from Don Peterson, the engineer in charge of developing of Wright's calcium sulfate based putty, called Allomatrix, indicated that Peterson had used test data described in Grisoni's lab notebook. From this, Grisoni argued that Wright had misappropriated proprietary information from Grisoni's notebook and that Grisoni should therefore recover any profits Wright realized on Allomatrix.

After the damages hearing, the trial judge issued lengthy written findings of fact and conclusions of law. In its findings of facts and conclusions of law, the trial court made specific credibility determinations, weighing heavily in favor of Grisoni. The trial court found Grisoni to be a "very credible witness" and found support for his testimony in other evidence in the record. In contrast, the trial court found the testimony of several of Wright's witnesses, particularly Dr. Haggard and attorney Haltom, to be untruthful and unsupported by other evidence. Specifically, the trial court found that Wright witnesses testified untruthfully regarding the source of the date alleged in the complaint as the date by which Grisoni had developed his ProFusion prototype. The trial court concluded that Wright must have learned this date from an unauthorized inspection of Grisoni's lab notebook during the period in which Grisoni was a consultant for Wright, in October 1997. The trial court also concluded, relying on Dr. Houk's testimony, that Wright knew or should have known, after its unauthorized review of Grisoni's lab notebook, that ProFusion was not developed by the use of any confidential information. Despite this, the trial court noted, Wright consistently sought injunctive relief against Grisoni and refused any offers by Grisoni to show that he had not used confidential information.

The trial court also reviewed at length the testimony of attorney William Haltom regarding his statements to Grisoni in the course of the settlement conference that Grisoni secretly recorded. The trial judge concluded that Haltom testified untruthfully that he did not tell Grisoni or his attorney at that time, Steve Biller, that he would "go to the FDA" if Grisoni refused to surrender his 510(k) on ProFusion. The trial court noted that Wright refused to consider Grisoni's overtures to demonstrate that he had not used confidential information and instead, through attorney Haltom, threatened Grisoni with criminal prosecution for perjury if he refused to surrender his 510(k) on ProFusion. From these facts the trial court concluded that Wright acted without probable cause, and that Wright's motivation in filing suit against Grisoni was to keep Grisoni out of the calcium sulfate bone void filler market, rather than any belief that Grisoni had developed ProFusion through the use of confidential information.

The trial court concluded that Grisoni had been wrongfully enjoined from participating in the bone void filler market for two years. As a result, the trial court found, Grisoni had suffered significant damages in the form of lost profits from sales of ProFusion and lost opportunities in developing new calcium sulfate products. It noted that, in Tennessee, damages from an injunction that has been wrongfully issued are limited to the amount of the injunction bond, unless there is a finding of malicious prosecution. Based on its finding that Wright was liable for malicious

-15-

prosecution, the trial court found that Grisoni's damages were not limited by the amount of the injunction bond. It found that the amount of damages sustained by Grisoni, while not mathematically certain, could reasonably be assessed. Considering the proof at the hearing, the trial court awarded Grisoni and Biogeneration $4.79 million in compensatory damages and an additional $408,000 per month for the next twelve months or until the final resolution of the case, whichever occurred first. The trial court declined to award damages on Grisoni's claim that Wright developed Allomatrix by utilizing wrongfully obtained material from Grisoni's lab notebook. The trial court found that "although there is a strong inference to support Defendants' contention [that Wright misappropriated material from the lab notebook], this court cannot say, by a preponderance of the evidence, that Wright's Allomatrix putty is the product of Grisoni's research and lab book information." On Grisoni's claim for punitive damages, the trial court found that Wright had acted with malice in instituting the injunction proceeding and awarded Grisoni punitive damages in the amount of $4.79 million. The final judgment was issued on May 10, 2000. On May 26, 2000, Wright filed its notice of appeal.

On May 30, 2000, Grisoni filed a motion with the trial court seeking an order requiring Wright and Travelers to post an appeal bond in the amount of $18 million. On that same day the trial court conducted a hearing to determine Wright's application for a stay of execution. The trial court granted a stay but ordered that Wright post a stay bond for $9.7 million. However, if Wright agreed to file with the Court of Appeals a consent order dissolving the temporary injunction, the bond would be reduced to $5 million. On June 21, 2000 the $5 million bond was posted and five days later the consent order was entered permitting Grisoni to begin producing and marketing ProFusion. On July 6, 2000, the trial court conducted a hearing to determine Travelers' liability on the injunction bond. The injunction bond provides:

> That the undersigned, Wright Medical Technology, Inc., as PRINCIPAL and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, as SURETY, are held and firmly bound unto Bernard F. Grisoni and Biogeneration, Inc., in the sum of Seven Thousand, Five Hundred and no/100 Dollars ($7,500.00) [later amended by rider to $250,000] for the payment of which well and truly to be made, we bind ourselves firmly by these presents:
>
> The condition of this bond is such that, whereas, WRIGHT MEDICAL TECHNOLOGY, INC., has sought and obtained a Temporary Restraining Order in this cause; now, if said Principal or Surety pays all damages and costs which any person may sustain by the suing out of such Temporary Restraining Order if the same is dissolved, this obligation to be void; otherwise, to remain in full force and effect.

Grisoni argued to the trial court that the terms of the Travelers' bond can be interpreted in two different ways. Grisoni admitted that the first paragraph limits Travelers' liability to the penal sum, $250,000. However, Grisoni argued that the second paragraph subjected Travelers to liability for the entire judgment in excess of $9 million. Grisoni asserted that the clause "if said Principal or Surety pays all damages and costs" creates an obligation for Travelers to pay all damages and costs.

Because Travelers drafted the instrument, Grisoni maintained, the second interpretation should prevail. The trial court rejected Grisoni's argument and fixed Travelers' liability at $250,000.

## ISSUES ON APPEAL

In this appeal, Wright, Grisoni and Travelers all raise issues to be considered by this Court. In addition, attorney Haltom, while not a party, filed an *amicus* brief in this appeal. The issues raised by all parties are outlined below.

On appeal, Wright contends that the evidence preponderates against the trial court's ruling that Grisoni did not use confidential information to develop ProFusion and obtain FDA approval and, consequently, erred in dissolving the injunction. In the alternative, even if the injunction was improperly issued, Wright argues that Grisoni is estopped from recovering damages resulting from the injunction because he consented to it. Further, Wright asserts that the evidence shows that Wright had probable cause to institute the lawsuit and acted without malice, and consequently, the trial court erred in finding liability for malicious prosecution. Wright also argues that the trial court erred in its award of compensatory damages because proof of the amount of Grisoni's damages was too speculative to support an award. Lastly, Wright argues that the evidence was insufficient to justify an award of punitive damages.

In response, Grisoni argues that the evidence establishes that his product, ProFusion, is considerably different than Wright's product, Osteoset. Grisoni contends that the evidence shows that he developed ProFusion and obtained FDA approval by using only information that was publicly available. Grisoni argues that the appellate court may reverse the trial court's order to dissolve the injunction only if it finds that the trial court abused its discretion in dissolving the injunction. In the alternative, even if the standard is preponderance of the evidence, Grisoni maintains that the trial court's decision to dissolve the injunction should be affirmed. On the trial court's decision to find Wright liable for malicious prosecution, Grisoni asserts that the evidence shows that Wright gained unauthorized access to Grisoni's lab notebook. In so doing, Grisoni contends, the evidence shows that Wright became aware that ProFusion was significantly different from Osteoset and that ProFusion was developed without the use of confidential information. Despite this, Grisoni argues, Wright sought and obtained injunctive relief and, therefore, should be held liable for malicious prosecution as well as punitive damages. Grisoni asserts that Wright's improper review of his lab notebook constitutes "unclean hands" and bars Wright from seeking equitable relief. Grisoni argues that the award of compensatory damages was supported by evidence that was not too speculative to support such an award. In the alternative, Grisoni argues that even in the absence of malicious prosecution, he is entitled to recover a statutory penalty under Tennessee Code Annotated § 29-23-104(a). Punitive damages were supported, Grisoni argues, by the evidence of malice and unclean hands. Grisoni asserts that the trial court erred in declining to award him damages for Wright's use of material allegedly misappropriated from his lab notebook to develop Allomatrix. Lastly, Grisoni asserts that the trial court erred in limiting Travelers' liability under the bond to $250,000.

On appeal, Travelers asserts that the trial court correctly limited its liability to $250,000. Under the terms of the bond, Travelers argues, it is unambiguous that its liability is limited to the penal amount of the bond. Travelers also argues that its liability on the bond was discharged when the trial court failed to enter judgment against it and, alternatively, that the bond was discharged upon Wright's filing of an appeal bond.

Attorney Haltom filed an *amicus* brief on appeal asking this Court to review the trial court's finding that he did not testify truthfully regarding his statements in the settlement conference with Grisoni. Haltom argues that this Court can review the credibility determination made by the trial court since Haltom's trial testimony can be compared to the transcript of the tape recorded settlement conference.

## ANALYSIS

In considering the issues raised on appeal, we analyze first the trial court's finding of liability for malicious prosecution. In connection with the award of damages for malicious prosecution, the award of punitive damages will be reviewed. Next we review the trial court's order dissolving the temporary injunction and its finding that Grisoni did not use confidential information in developing ProFusion. In connection with this, we address Wright's contention that Grisoni cannot obtain compensatory damages for wrongful issuance of the injunction because he consented to it, as well as the award of damages for wrongful issuance of the injunction. The remaining issues on appeal will then be discussed.

## MALICIOUS PROSECUTION AND PUNITIVE DAMAGES

The elements of a cause of action for malicious prosecution are well settled. They are: (1) a judicial proceeding that has been instituted by the defendant and finally resolved in the favor of the claimant; (2) the defendant instituted the proceeding without probable cause; and (3) the defendant acted with malice. *Roberts v. Federal Express Corp.*, 842 S.W.2d 246, 247-248 (Tenn. 1992). The claimant bears a heavy burden of proof in establishing the element of lack of probable cause and the element of malice. *Kauffman v. A. H. Robins Co., Inc.*, 448 S.W.2d 400, 404 (Tenn. 1969). Probable cause exists where the original plaintiff possessed a reasonable belief in both the existence of facts supporting his claim and that those facts made out a legally valid claim. *Buda v. Cassel Bros., Inc*, 568 S.W.2d 628, 631-632 (Tenn. Ct. App. 1978). The reasonableness of the defendant's belief and conduct is a factual determination. *Roberts*, 842 S.W.2d at 248-249 (overruling earlier cases holding that whether probable cause existed at the time the proceeding was instituted is a legal determination). The plaintiff may rely on the advice of counsel as to the validity of the claim where the advice is sought in good faith and is given after fair and complete disclosure of all relevant facts in his possession and all facts he could have ascertained by reasonable diligence. *Kelley v. Tomlinson*, 46 S.W.3d 742, 748 (Tenn. Ct. App. 2000). As to malice, the claimant need not prove ill will or personal hatred, so long as he demonstrates an improper motive. *Lawson v. Wilkinson*, 447 S.W.2d 369, 374 (Tenn. Ct. App. 1969). While malice may be inferred from a total absence of

probable cause, no amount or kind of malice is sufficient to establish lack of probable cause. *Nashville Union Stockyards, Inc. v. Grissim*, 13 Tenn. App. 115, 126-127 (Tenn. Ct. App. 1930).

In this case, the trial court found Wright liable for malicious prosecution and awarded Grisoni compensatory damages on this claim. Compensatory damages were awarded to Grisoni in the amount of $4.79 million for the period of April 3, 1998 through April 2, 2000, and $408,000 per month thereafter until resolution of the lawsuit.

The trial court's finding of malicious prosecution was based on its factual finding that Wright officials improperly gained access to Grisoni's lab notebook while Grisoni worked as a consultant for Wright. From this finding, the trial court inferred that Wright knew the entire content of Grisoni's lab notebook prior to filing suit. The trial court credited testimony to the effect that anyone looking at Grisoni's lab notebook would know that ProFusion was developed without the use of confidential information, and from this concluded that Wright instituted the lawsuit against Grisoni without probable cause. The trial court's finding of malicious prosecution was also premised on its conclusion that Wright's attorneys were untruthful and threatening to Grisoni, for the sole purpose of preventing Grisoni from introducing into the market a product to compete with Osteoset. The trial court's factual findings were based in part on its determination of the credibility of the witnesses for both parties.

When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id*.; *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). Where there is conflict in the testimony that requires a determination of the credibility of a witness, the trial court's finding is binding on the appellate court "unless from other real evidence the appellate court is compelled to conclude to the contrary." *Hudson v. Capps*, 651 S.W.2d 243, 246 (Tenn. Ct. App. 1983) (citing *State ex rel Balsinger v. Town of Madisonville*, 435 S.W. 2d 803, 807 (Tenn.1968)).

On appeal, Wright argues that the trial court erred in finding that Wright improperly gained access to Grisoni's lab notebook while Grisoni worked at Wright as a consultant. The trial court's finding is based on Wright's allegation in the complaint that Grisoni had developed his prototype of ProFusion "by" September 8, 1997. Grisoni testified that he had told no one that he developed the ProFusion prototype on September 8, that the only document containing the date was Grisoni's lab notebook, and that the lab notebook was not disclosed to Wright until discovery commenced, well after Wright's complaint was filed. Grisoni testified that, while he worked as a consultant for Wright, he often left his lab notebook unattended on his desk, located near Haggard's office. While Haggard denied accessing Grisoni's lab notebook, the trial judge found that Haggard was not a credible witness. The trial court noted the statement by Wright's attorney, Steven Vescovo, that he

knew where the September 8 date in the complaint came from, but that Grisoni's attorney could not ask him about it.

In a situation such as this, the trial court's assessment of the credibility of the witnesses is necessarily dependent on the trial judge's evaluation of the witnesses' demeanor and manner while testifying under these circumstances; the trial court's determination on the witnesses' credibility must be accorded great weight by the appellate court. *See Estate of Walton*, 950 S.W.2d at 959.

In this case, the trial court credited Grisoni's testimony that the only way anyone could have known the date on which the ProFusion prototype was developed was by looking at his lab notebook. The trial judge discredited Haggard's denial that he improperly accessed the lab notebook. From this the trial judge inferred that Wright officials improperly accessed Grisoni's lab notebook and, moreover, inferred that Wright officials thereby gained knowledge of everything in the lab notebook. While this is a far-reaching conclusion to infer, we find that it is a permissible inference. With due deference to the trial court's determination of credibility, we find that the evidence does not preponderate against this factual finding.

Next we examine the trial court's finding that Wright's attorney, William Haltom, was untruthful and improperly threatening to Grisoni. This is a unique credibility determination in which the issue is whether Haltom testified truthfully at trial regarding his recollection of what he said in settlement conference. Since Grisoni secretly taped the settlement conference, this is not just a swearing contest between Haltom and Grisoni. Rather, determining Haltom's credibility involves comparing his testimony at trial to the transcript of the settlement conference.

In the settlement conference, Haltom noted that Grisoni swore in the 510(k) application for the FDA that ProFusion is identical to Osteoset, but in his deposition Grisoni denied that ProFusion was identical to Osteoset. Haltom said in the settlement conference that one or the other is not the truth. Haltom told Grisoni and his attorney Steve Biller that Wright would pursue the lawsuit and would go back to the FDA and would give information on Grisoni's contradictory statements to both the FDA and the chancery court.

In the settlement conference, Grisoni's attorney Biller explained to Grisoni that, based on Grisoni's contradictory deposition testimony, Wright could go to the FDA and contest the validity of his 510K and Grisoni would "wind up with zero." Haltom said "it's a little more serious than that" and that "there's obvious implications for making false statements to the FDA. . .," and promised to pursue those remedies unless Grisoni agreed to surrender his 510K and make the injunction permanent.

In Haltom's testimony at trial, Haltom was asked by Grisoni's attorney what was discussed at the meeting. Haltom described the contradiction between Grisoni's sworn statement to the FDA and his deposition testimony, said that he told Grisoni and Biller that Wright wanted Grisoni to surrender his 510(k), testified that he asserted that Wright would pursue its civil remedy in court, and

stated that Wright had "an absolute right to go back to the FDA and point out his sworn testimony under oath which establishes a direct contradiction to everything he submitted to the FDA."

Haltom was asked repeatedly whether he told Grisoni that if he did not surrender his 510(k), Haltom would notify the FDA. Haltom replied "no" and then explained that he told Grisoni that, as a lawyer, he had an obligation to pursue a civil remedy, including "going back to the FDA and saying you issued a 510(k), and according to the man you issued the 510(k) to, what he told you in this document he now says under sworn testimony isn't true."

In heated exchanges between Haltom and Grisoni's attorney at trial, Steve Markowitz, Haltom was also asked if he told Grisoni that the implications for making false statements were clear. Haltom said that he did not recall using those words, denied threatening Grisoni with criminal prosecution, denied unethical conduct, said he had no idea what the implications were for making false statements to the FDA, and said that he never threatened Grisoni with anything other than pursuing a lawful civil remedy.

In its findings on credibility, the trial court characterized the testimony of Wright's witnesses, naming Haltom specifically, as "either untruthful, inaccurate or strained credibility. . . ." In discussing his conclusion that Haltom was not truthful, the trial court stated:

> 47. On June 3, 1998, a settlement conference was held at the Thomas [sic] Hendrix law firm office with Dr. Grisoni, Attorney Biller, and Attorney William Haltom, Jr. Unbeknowing to all the attorneys, Dr. Grisoni secretly recorded the entire conversations at the meeting.
>
> 48. In the recorded tape of the meeting, Attorney Haltom made it very clear that Wright was concerned about Dr. Grisoni and Biogeneration's entry into the calcium sulfate bone void filler market, by securing FDA approval. Attorney Haltom specifically stated that "this matter (lawsuit) can be brought to an end if Dr. Grisoni will surrender [to Wright] his 510(k)" approval from the FDA and consent to making the temporary injunction permanent.
>
> 49. Attorney Haltom specifically told Dr. Grisoni that "you've got to agree to a permanent injunction, and part of that would be surrendering the 510(k), but that would be the most crucial."
>
> 50. In a further effort to persuade Dr. Grisoni to give in to Wright's demands, Attorney Haltom made the following statement:
>
>> a. "We're prepared, starting tomorrow to go forward with a least a two-part war in this case - the court of FDA and the Shelby County Chancery Court."

b. " . . . there's obvious implications for making false statements to the FDA. . . ."

c. "Dr. Grisoni either didn't tell the truth to the FDA or he hasn't told the truth to the chancellor (per his deposition) . . . we're prepared to give that information to both the FDA and to the chancellor. . . ."

51. Attorney William Haltom, Jr. was not truthful when he testified under oath at trial, on behalf of Wright, that he never told Mr. Biller or Dr. Grisoni that he would go to the FDA if Dr. Grisoni did not surrender the 510 (k).

52. Notwithstanding the clarity of the threat to Dr. Grisoni at the June 3rd meeting, as contained on the recorded tape and transcript, Attorney Haltom at trial testified that Attorney Biller never indicated to him that he felt like he was threatening Dr. Grisoni with criminal action (for perjury). He said that:

To the contrary, [Attorney Biller] and I have talked since this, and he said that there was no threat ever made, [and] that he's willing to support me on this.

Findings of Fact and Conclusions of Law (References to trial exhibits deleted).

This credibility determination presents a unique situation. In contrast to the trial court's determination of the witnesses' credibility regarding the alleged improper access to Grisoni's lab notebook, the questions to Haltom centered on his recollection of statements made at the settlement conference, and the truthfulness of his testimony can be ascertained from a comparison of his testimony to the tape of the settlement conference. In comparing the two, it is clear that Haltom's testimony overall is consistent with what was said during the settlement conference. When asked if he told Grisoni that, if he did not surrender his 510(k) that Wright would notify the FDA, Haltom's initial response was "no."[15] Immediately thereafter, however, and indeed repeatedly in his testimony, Haltom acknowledged telling Grisoni that Wright would go back to the FDA to point out the contradiction between his deposition testimony and his statements to the FDA. Thus, while the trial court made a factual finding that Haltom "was not truthful when he testified under oath at trial, on behalf of Wright, that he never told Mr. Biller or Dr. Grisoni that he would go to the FDA if Dr. Grisoni did not surrender his 510(k)," with due deference to the trial court's role in assessing credibility, we must conclude that this finding is clearly erroneous. *See Hudson v. Capps*, 651 S.W.2d 243, 246 (Tenn. Ct. App. 1983)(holding that the trial court's determination of credibility is "binding on the appellate court unless from other real evidence the appellate court is compelled to conclude to the contrary"). *See also Krick v. City of Lawrenceburg*, 945 S.W.2d 709, 712 (Tenn. 1997)(holding that where all the proof is by deposition, appellate court may draw its own conclusions about credibility).

---

[15]The Court takes judicial notice that lawyers can be pugnacious witnesses.

-22-

Moreover, in support of the finding of malicious prosecution, the trial court relies on statements made during the settlement conference that, to settle the case, Grisoni must surrender his 510(k) on ProFusion; if not, Wright would wage a "two-part war" by pursuing the chancery court lawsuit and contacting the FDA. Citing Haltom's statements during the settlement conference that, if Grisoni did not surrender his 510(k), Wright would give the information on Grisoni's deposition testimony to the FDA and that "there's obvious implications for making false statements to the FDA . . . ," the trial court characterized these statements as "threats." It concluded from all of this that Wright's "primary motivation" in filing the lawsuit was to deny Grisoni "entry into its formerly exclusive calcium sulfate bone void filler market" and, based on this, found Wright liable for malicious prosecution.

We must ascertain whether these statements, made during the course of a settlement attempt, can be the basis for a finding of malicious prosecution. In an unfair competition lawsuit such as this, it is axiomatic that the actions of the plaintiff, in filing the suit, are motivated by a desire to prevent the defendant from competing. Of course, this cannot be accomplished by filing a groundless lawsuit; however, the mere fact that the plaintiff desires to prevent the defendant from introducing into the market a competing product cannot be the basis for a finding of malicious prosecution. This fact indicates neither malice nor lack of probable cause.

Likewise, the statements made during the settlement conference, that Wright would pursue the lawsuit and go to the FDA if Grisoni did not surrender his 510(k), cannot be the basis for a finding of malicious prosecution. The trial court characterized these assertions as "threats," and that is not inaccurate. However, this is the harsh reality of litigation. Provided the lawsuit was not groundless, Wright had the legal right to pursue the chancery court litigation and to use legal means to call into question the validity of Grisoni's 510(k) on ProFusion. The trial court emphasized, and Grisoni calls unethical,[16] Haltom's statement during the settlement conference that "there's obvious implications for making false statements to the FDA. . . ." While a perjury prosecution might result from Wright contacting the FDA regarding Grisoni's contradictory deposition testimony, Wright had a reasonable legal basis for questioning the validity of Grisoni's 501(k), regardless of peripheral consequences to Grisoni. This is an ugly but unavoidable consequence of settlement negotiations; each side must try to convince the other that refusing to relent to its settlement demand will result in consequences that are worse than giving in to the settlement demand. Provided the lawsuit is not groundless, statements of this type in settlement negotiations cannot form the basis for a finding of malicious prosecution.

The finding of malicious prosecution must now be evaluated in light of the remaining evidence. As noted above, the trial court found, based on its credibility determinations, that Wright had knowledge of the entire contents of Grisoni's lab notebook on ProFusion prior to instituting this lawsuit. At the same time, however, there are a number of other facts of which Wright was aware at the time the lawsuit was instituted. It is undisputed that Wright had knowledge that Grisoni had

---

[16]Grisoni's allegation, that Haltom's statement constitutes a threat of criminal prosecution that violates the rules of ethics which govern attorneys, is not pertinent to this action.

developed a prototype of ProFusion within a month of leaving his employment with Wright, a process that had taken Wright over a year of trial-and-error experimentation with Osteoset.[17] Wright knew that Grisoni had represented to the FDA that ProFusion was "identical" to Osteoset. Assuming that Wright knew that ProFusion utilized the beta form of calcium sulphate, Wright knew that Grisoni had been privy to Wright's experimentation with both the alpha and beta forms while Osteoset was being developed. Wright knew that ProFusion was being marketed in a pellet form that was nearly identical to Osteoset. Wright knew that Grisoni had used a process and methodology in his 510(k) application with the FDA that had great similarities to the process used by Wright in its 510(k) for Osteoset, a process that had included over a year of experimentation and modification by Wright, including an initial rejection by the FDA. Wright had knowledge of all of these facts in light of this Court's decision in *Hickory Specialties*, in which the Court held that, despite the fact that the processes in question were based on existing technology and potentially could have been developed by independent technology, the defendant former employee could be enjoined because he in fact used his knowledge of the confidential process obtained through his position with his former employer. *Hickory Specialties, Inc. v. B & L Laboratories, Inc.*, 592 S.W.2d 583, 587 (Tenn. Ct. App. 1979). Thus, Wright had reason for a good faith belief that Grisoni had developed ProFusion and applied for the 501(k) with the FDA by utilizing confidential information that he obtained during his employment with Wright. In light of *Hickory Specialties*, and the undisputed evidence, we must conclude that Wright had a reasonable basis for believing that it had a good chance of establishing grounds for its civil claim against Grisoni. *See Buda v. Cassel Bros., Inc.*, 568 S.W.2d 628, 631-632 (Tenn. Ct. App. 1978); *Taylor v. Morris*, No. 01A01-9804-CH-00211, 1999 WL 675138, at *4 (Tenn. Ct. App. Sept. 1, 1999).

Grisoni contends that Wright should be held liable for malicious prosecution for continuing the litigation as well. However, the trial court's conclusion that the temporary injunction was wrongfully issued hinges in large part on its credibility determination in Grisoni's favor. Grisoni testified essentially that he developed ProFusion by independent technology and not from using information he obtained while employed at Wright. Under *Hickory Specialties*, of course, even if the process could potentially be developed by independent technology, the employee could be held liable if he in fact used knowledge of the confidential process that he obtained while employed by the plaintiff employer. 592 S.W.2d at 587. Wright, of course, is not required to know in advance of the injunction hearing that the trial court would credit Grisoni's testimony that he developed ProFusion by independent technology and not through the use of knowledge he obtained while at Wright regarding the development of Osteoset. *See ILG Indus., Inc. v. Scott*, 273 N.E.2d 393, 398 (Ill. 1971) ("In many cases the question of whether a specific matter is a trade secret is an extremely close one, often not readily predictable until a court has announced its ruling."). Grisoni's assertions were highly disputed. Consequently, in its continuation of the litigation, up to the trial court's finding that the injunction should be dissolved, Wright still had a reasonable basis for believing that

---

[17] Wright was able to develop an Osteoset prototype within a few weeks of opening the package of Ethicon pellets and Grisoni argues that this mitigates against Wright's assertion that the development of an Osteoset device occurred over a long period of trial-and-error experimentation and at great expense. However, Wright did not start from scratch upon opening the Ethicon packet. Rather, Wright was able to use much of what it had learned during the previous year's research into other calcium sulfate products.

it had a good chance of establishing grounds for its civil claim against Grisoni. After that point, continuation of the injunction was simply to preserve the status quo pending appeal. Under these circumstances, we cannot conclude that the evidence establishes either malice or lack of probable cause for Wright's continuation of the litigation. Accordingly, the trial court's finding that Wright is liable for malicious prosecution must be reversed.

In light of this holding, we must review the trial court's award of punitive damages. The trial court awarded punitive damages in the amount of $4.79 million, after noting that punitive damages could be awarded only if Wright's conduct amounted to "fraud, malice, oppression, gross negligence or outrageous conduct," and citing *Davenport v. Chrysler Credit Corp.*, 818 S.W.2d 23 (Tenn.Ct. App. 1991). The standard for punitive damages was refined further in *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992). In *Hodges*, the Tennessee Supreme Court cautioned that punitive damages should be awarded only in cases involving "the most egregious of wrongs." *Id.* at 901. The Court emphasized that it sought to avoid "dull[ing] the potentially keen edge of the doctrine as an effective deterrent of truly reprehensible conduct." *Id.* (quoting *Tuttle v. Raymond*, 494 A.2d 1353, 1361 (Me. 1985)). It held that, in order to award punitive damages, the trial court must find "intentional, fraudulent, malicious or reckless conduct by clear and convincing evidence." *Id.*

In this case, we have reversed the finding of malicious prosecution, concluding that Wright had a reasonable belief that it had a good chance of establishing grounds for its civil claim against Grisoni. Under these circumstances, the award of punitive damages is not warranted and must be reversed.

**WRONGFUL INJUNCTION**

Wright also argues on appeal that the trial court erred in dissolving the injunction against Grisoni. Resolution of this issue turns on whether the evidence preponderates against the trial court's finding that the information Grisoni used in developing and obtaining regulatory approval for ProFusion was available through independent research of public sources. Wright argues that the evidence shows that ProFusion was the product of Grisoni's prior access to Wright's confidential sources and its trial-and-error experimentation.

An employee may, of course, enter into an agreement with his employer barring him from engaging in any competition with the employer. *Heyer-Jordan & Assocs., Inc. v. Jordan*, 801 S.W.2d 814, 821 (Tenn. Ct. App. 1990). In the absence of such an agreement, once the employment relationship ends, the employee is free to develop and market products which compete with those of his former employer. *Ed Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 936, 941 (Wash. 1999). However, the employee is still bound by the general duty not to disclose confidential information or trade secrets belonging to the former employer; violation of this duty gives rise to a cause of action in the employer to obtain relief against the former employee. *Id.* at 941-942 (citing Restatement (Third) of Unfair Competition § 42 cmt. b (1995)).

In addition to any common law duties, Grisoni also executed a confidentiality agreement. Similar to the standard under the common law, the agreement prohibits Grisoni from using or disclosing any of Wright's trade secrets or confidential information, but does not apply to "any information which has become publicly available through no fault of" Grisoni. The agreement, of course, must be interpreted by reference to common law principles. *Dynamics Research Corp. v. Analytic Sciences Corp.*, 400 N.E.2d 1274, 1288 (Mass. App. Ct. 1980) (finding that a "non-disclosure agreement only affirmed the intent of the parties to be bound by the common law of trade secrets").

The burden of proof in a lawsuit to protect employer trade secrets was discussed in *Hickory Specialties, Inc. v. B&L Laboratories, Inc.,* 592 S.W.2d at 586 (citing *Smith v. Dravo Corp.*, 203 F.2d 369 (7th Cir. 1953)). In such a lawsuit, the employer has the burden of proving that trade secrets were communicated to the employee in the course of a confidential employment relationship and that the employee is attempting to use those secrets to the detriment of the employer. *Id.* A trade secret is "any formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it." *Id.* (quoting *Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng. Corp.*, 255 F.Supp. 645, 653 (E.D. Mich. 1966)). Confidential information is closely analogous to a trade secret and warrants similar protection. *See Vantage Technology, LLC, v. Cross*, 17 S.W.3d 637, 645 (Tenn. Ct. App. 1999); *Heyer-Jordan*, 801 S.W.2d at 821. Several factors to consider in determining whether a piece of information constitutes a trade secret are:

(1) the extent to which the information is known outside of the business;

(2) the extent to which it is known by employees and others involved in the business;

(3) the extent of measures taken by the business to guard the secrecy of the information;

(4) the value of the information to the business and to its competitors;

(5) the amount of money or effort expended by the business in developing the information;

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others;

*Venture Express, Inc. v. Zilly*, 973 S.W.2d 602, 606 (Tenn. Ct. App. 1998). Thus, the extent to which the information has become available outside the confidential relationship is significant. To constitute a trade secret, it must be difficult for anyone outside the confidential relationship to acquire the information by proper means. *Hickory Specialties,* 592 S.W.2d at 587. Information which has become readily available through public sources or is generally well known in the industry

cannot be considered confidential. *Id.* However, information which was acquired by the defendant through the confidential relationship may be protected even if the information potentially could have been obtained through independent research. *Id.* This is particularly true where acquisition of the information through independent research would be difficult, costly, or time consuming. *Essex Group, Inc. v. Southwire Co.*, 501 S.E.2d 501, 504 (Ga. 1998). In *Hickory Specialties*, the Court observed, "[t]he potential to develop the process by independent technology, affords the [former employee] no excuse to obtain the process through a confidential employer-employee relationship and then compete with the developer [of the process.]." 592 S.W.2d at 587. Thus, even if the process could have been developed by independent technology, it may be protectible if the former employee does not develop it by independent technology but in fact obtains his knowledge of the process from his former employer and then uses this knowledge to compete with the former employer.

Moreoever, even if individual pieces of information may be publicly known, the integration of the information into a unified process may be confidential or a trade secret:

"The fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements." Restatement of the Law 3d, Unfair Competition (1995), §39 (f), p. 432. Hence courts have recognized that "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectible secret."

*Essex Group,* 501 S.E.2d at 503 (quoting *Water Services, Inc. v. Tesco Chemicals, Inc.*, 410 F.2d 163, 173 (5th Cir. 1969)). Thus, even if portions of the information used are in the public domain, the integration of the information into a process not commonly known may be protectible.

However, while a former employee cannot use confidential business information, he is entitled to use the general knowledge, skill and experience he acquired over the course of his employment. *See Dynamics Research*, 400 N.E.2d at 1282. The former employee "cannot be compelled to erase from his mind all of the general skills, knowledge and experience acquired through his experience." *ILG Indus., Inc. v. Scott*, 273 N.E.2d 393, 396 (Ill. 1971). The employer's burden is greater where the employee brings to the job extensive experience, "for the loss to the individual and the economic loss to society are both greatest when a highly trained and specialized person is prevented from employing his special abilities." *Dynamics Research*, 400 N.E.2d at 1282-83 (quoting *Blake, Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 684-85 (1960)). It can be difficult to draw the line between confidential business information, which cannot be used, and the former employee's general knowledge, skill and experience, which can used. In *Essex Group* the employer Southwire developed a logistics system in the cable and wire industry. 501 S.E.2d at 502. Southwire's logistics system was developed over a lengthy time period at considerable expense, in a project headed by the defendant former employee, McMichael. *Id.* McMichael left Southwire and began working for a direct competitor, Essex, in its logistics

department developing a logistics system for Essex. *Id.* To determine whether the information Southwire sought to protect was part of McMichael's general knowledge, skill and experience, the court looked at whether the information would be of value to McMichael if he were not employed by a direct competitor of his former employer:

> The specific information McMichael possessed would not have availed another company that was not a direct competitor of Southwire. In other words, McMichael brought to Essex not only the general information acquired in his job, i.e., that a certain logistical factor such as the positioning of storage containers would need to be resolved before certain other factors were decided: [sic] McMichael also brought specific information, such as how, where, and when those storage containers had to be positioned so as to accommodate most efficiently the very same product Essex was producing in competition with Southwire.

*Id.* at 504. The *Essex* court offered an example:

> For example, had McMichael taken a position overseeing the logistics system start-up at a company that manufactured a totally different product, like pet goods or kitchen wares, he could be said to be utilizing his general knowledge regarding the manner in which a logistics system should be designed, since there would be no practical application for the specific, protected information he obtained while working at Southwire about the precise design that maximizes a logistics system for a cable and wire business.

*Id.* at 504, n.3. Thus, where the information is specific and confidential and would be useful primarily to a direct competitor of the former employer, it is likely not part of the former employee's general skill, knowledge and experience and is protectible.

Grisoni argues that the parties are governed by the confidentiality agreement executed by Grisoni, rather than the common law. The provisions of the confidentiality agreement are broad; the agreement provides,

> I will not disclose to anyone or use either during or after my employment, except with the prior written consent of Wright Medical Technology, any trade secret, confidential know-how or confidential business or technical information of Wright Medical Technology. The foregoing obligation shall also apply to any trade secrets or other confidential information of any third party learned by me as a Wright Medical Technology employee and which Wright Medical Technology has an obligation to maintain in secrecy.

Therefore, it covers trade secrets, "confidential knowhow," and confidential business and technical information, as well as confidential information learned from a third party during Grisoni's employment. It excludes information which has become publicly available. Thus, the provisions

-28-

of the confidentiality agreement are not appreciably different from the common law. ***See Dynamics Research Corp.***, 400 N.E.2d at 1288 (finding that "non-disclosure agreement only affirmed the intent of the parties to be bound by the common law of trade secrets"). We must view the issue of whether information has become "publicly available" from a common sense standpoint, against the backdrop of the common law discussed above.

The facts in this case must now be evaluated in light of these legal standards. In this case, Wright emphasized that it viewed the overall process of developing and obtaining FDA approval for Osteoset as confidential, not simply the individual items of information which were integrated into the process. ***See*** Restatement (Third) of Unfair Competition §39 cmt. f (1995) (quoted in ***Essex Group,*** 501 S.E.2d at 503). Haggard emphasized this in his testimony before the trial court below:

> Q. Let me stop you for a second. Is there anything in your last statement that we started from the 31 parts that you consider to be proprietary, confidential, or a trade secret, and if so, what?
> A. Again, sir, we consider this process to be proprietary.
> Q. Each – go back – then each part of it.
> A. No. We consider the process to be proprietary–
> Q. I want you to tell me each part of it.

Later, Haggard testified:

> Q. Is that step proprietary, confidential, or a trade secret?
> A. And as I was trying to answer before I was interrupted, we consider the procedure for making the pellets to be proprietary. Within that procedure, there may be certain elements that are not proprietary, that are common knowledge, but when you put them all together to make the overall procedure to make the pellets, that is what becomes proprietary....
>
> Again, in these individual steps, sifting itself is not proprietary. My mother sifts flour when she makes biscuits. I mean, we all know that. But doing the steps in this order and making sure that the material goes into the water first so it can completely wet out and mixing it for 60 seconds and not mixing and over-mixing it, that is where you get into some of the proprietary nature of this process.

The integration of all of this information into a process not commonly known can be protectible. Wright also asserts that there were numerous elements of information learned by Grisoni for which there was no public source. Broadly stated, these elements of information include the following:

1. Information Wright, and Grisoni, obtained from third parties such as U.S. Gypsum;

2. Studies, typically conducted by Grisoni, on the characteristics, dissolution rates, similarities and differences between alpha calcium sulfate and beta calcium sulfate, and the physical and chemical properties of medical grade calcium sulfate;

3. Techniques for including antibiotics in bone void filler;

4. Details on the molding process for Osteoset and which materials and processes worked best;

5. Details on the process for making Osteoset, such as the "working time" for the compound, and the temperature and humidity levels at which the product was kept;

6. Details on the dissolution tests and other measures taken by Wright to get FDA approval for Osteoset;

7. The chemical specifications for Osteoset and its predicate device, Ethicon;

8. Information on the market for bone void fillers, and Wright's marketing techniques and strategies.

Some of this information could potentially fall within the purview of Grisoni's general skill, knowledge and experience, but most would not. Grisoni came to Wright highly educated and with extensive experience. *See Dynamics Research Corp.*, 400 N.E.2d at 1282. For example, Grisoni had considerable experience in silicon molding prior to coming to Wright. However, it is undisputed that, prior to joining Wright, Grisoni had no experience working with calcium sulfate. All of his experience in calcium sulfate production came at Wright's expense during Grisoni's employment. Indeed, much of the information Wright seeks to protect is of the type that could be deemed confidential information. While various elements are commonly known, Wright integrated these elements into a process that could be deemed protectible. *See* Restatement (Third) of Unfair Competition §39 cmt. f (1995). It is undisputed that Wright invested substantial time, effort and money into developing Osteoset and obtaining FDA approval for it, and that its efforts included considerable trial and error. The information Grisoni learned about bone void fillers would be of use primarily to direct competitors of Wright, and would be only of marginal value to a business that manufactured a different product. *See Essex Group*, 501 S.E.2d at 504. Moreover, there is evidence that Wright kept the information confidential. For instance, all Wright employees are required to sign confidentiality agreements, and files relating to the development of products, including 510(k)s, are marked confidential and usually kept under lock and key.

Yet, as to the majority of the information Wright seeks to protect, Grisoni presented testimony indicating Wright was not entitled to protection. For example, Grisoni was able to produce a number of public sources describing the general use and production of calcium sulfate bone void filler products. Wright's own technical monograph stated that "clinical use of calcium sulfate as a bone substitute for dental and orthopedic applications has been reported in literature for

more than a century." Further, by the time Grisoni was terminated, Wright had published a number of brochures and user guides describing its new device and had submitted several press releases to Memphis newspapers describing the virtues of their product and the ever expanding market for bone graft substitutes. *See ILG Indus.*, 273 N.E.2d at 396 ("[S]omething which is fully and completely disclosed by a business through its catalogs or literature disseminated throughout an industry cannot be a trade secret.").

Grisoni also presented testimony that, in many respects, ProFusion is significantly different from Osteoset, and that the manufacturing of ProFusion does not require Grisoni to use confidential information. The manufacture of Osteoset involves an elaborate process involving highly specialized equipment and large scale production methods. In contrast, Grisoni manufactures ProFusion on a much smaller scale, often utilizing standard kitchen utensils and raw materials purchased over-the-counter. While each production method starts out with the powdered form of calcium sulfate dihydrate, Grisoni produces the beta-type hemihydrate by simply heating the dihydrate in a household oven, while Wright produces the alpha-type hemihydrate using specialized heating and pressurizing equipment. Wright asserts that Grisoni learned confidential information on including antibiotics in bone void filler because Osteoset was initially loaded with antibiotics. However, there is no indication that Grisoni included antibiotics in ProFusion. As to other phases of the manufacturing process, Grisoni presented evidence either that the process was widely known, such as using gamma radiation for sterilization, or that Grisoni gained knowledge of the process in his employment prior to Wright, such as the molding processes.

In other respects, Grisoni testified that he developed ProFusion and applied for FDA approval by conducting independent research after leaving his employment with Wright. Given the fact that Grisoni developed his prototype for ProFusion within a month after leaving Wright and filed the 510(k) on ProFusion within a short time thereafter, this testimony seems dubious. However, there is no documentary or other evidence indicating that the trial court erred in determining that Grisoni's testimony was truthful. Unless there is other real evidence which compels a contrary conclusion, the credibility determination of the trial court is binding on the appellate court. *See Hudson v. Capps*, 651 S.W.2d 243, 246 (Tenn. Ct. App. 1983).

Moreover, Grisoni notes persuasively that Wright's advantage in developing a calcium sulfate bone void filler product did not come primarily from a secret design or manufacturing technique; rather, Wright's advantage came from its ability to obtain FDA clearance. Wright's ingenuity in acquiring Ethicon pellets and using Ethicon as its predicate device gave it an advantage over its competitors, at least for a time. However, evidence was presented that once Osteoset was approved by the FDA, it was only a matter of time before other producers of orthopedic devices used Osteoset as a predicate device to obtain FDA approval for their products.[18] A trade secret does not exist simply because a producer has no competitors or even because it has produced a novel product.

---

[18] Grisoni's knowledge allowed him to avoid much of the trial-and-error experimentation that would plague other new entrants into the market. This fact is significant but not necessarily determinative. *Koehring Co. v. E.D. Ethyre & Co.*, 254 F.Supp. 334, 339 (N.D. Ill. 1966).

*See Koehring Co. v. E.D. Etnyre & Co.,* 254 F. Supp. 334,339 (N.D. Ill. 1966). The producer's advantage must come from some design or process which remains generally unknown in the industry. *Id.*

In addition, while Grisoni was aware of Wright's use of dissolution rate comparison in its 510(k) for Osteoset, Grisoni presented evidence that dissolution rate comparison was an obvious choice to demonstrate "substantial equivalency" with Osteoset since its relevant characteristic was that its dissolution rate was roughly equal to the rate of new bone growth. Therefore, if this evidence is credited, Grisoni's knowledge of Wright's dissolution testing offered him little advantage over other Wright competitors.

While the evidence overall presents a close question, giving due deference to the trial judge's determinations of credibility, we must conclude that the evidence does not preponderate against the trial court's dissolution of the injunction. The decision of the trial court is affirmed on this issue.

## DAMAGES

We must now consider the damages that Grisoni may recover for the wrongful issuance of the injunction. Rule 65.05(1) of the Tennessee Rules of Civil Procedure requires a party seeking a temporary injunction to provide indemnity "for the payment of such costs and damages as may be incurred or suffered by any person who is found to have been wrongfully restrained or enjoined." Tenn. R. Civ. P. 65.05.(1). The purpose of the rule is "to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *South Central Tenn. R.R. Auth. v. Harakas*, 44 S.W.3d 912, 916 (Tenn. Ct. App. 2000) (quoting *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999)). Injunction bonds have long been required under Tennessee law. *Pyott Land & Mining Co. v. Tarwater*, 150 S.W. 539 (Tenn. 1912).

As noted by the trial court in its memorandum opinion, Tennessee adheres to what is sometimes called the "injunction bond rule." *See Shanks v. Payne*, 174 S.W.2d 461, 463, (Tenn. 1943); *Taylor v. Morris*, No. 01A01-9804-CH-00211, 1999 WL 675138 at *3 (Tenn. Ct. App. Sept. 1, 1999); 42 Am. Jur. 2d *Injunctions* §338. Under this rule, a wrongfully enjoined party's damages are limited to the amount of the injunction bond, in the absence of malicious prosecution. *Shanks*, 174 S.W.2d at 463; *Taylor*, 1999 WL 675138 at *3; 42 Am. Jur. 2d *Injunctions* §338. The reasoning behind the rule is that the party seeking the injunction "consents" to potential liability, up to the amount of the bond, as the price paid for the injunction. *See* 42 Am. Jur. 2d *Injunction* §338.

In seeking damages under the injunction bond, the enjoined defendant need not show that the plaintiff acted with any degree of fault. *South Central Tenn. R.R. Auth.*, 44 S.W.3d at 920; See also, Note, *Interlocutory Injunctions and the Injunction Bond*, 73 Harv. L. Rev. 333, 333 (1959) ("The American cases indicate that the purpose of the bond is to provide indemnity even when the plaintiff is not at fault."). The defendant need only show that he was wrongfully restrained or enjoined. *Taylor*, 1999 WL 675138 at *3. "A party has been wrongfully enjoined within the

meaning of [Rule 65.05] when it turns out the party enjoined had the right all along to do what it was enjoined from doing.' " *South Central Tenn. R.R. Auth.*, 44 S.W.3d at 917 (quoting *Nintendo of America v. Lewis Galoob Toys*, 16 F.3d 1032, 1036 (9th Cir. 1994)).

In this case, the finding of liability for malicious prosecution has been reversed. Consequently, Grisoni's damages for the wrongful injunction are limited by the amount of the injunction bond, i.e. $500,000.[19]

Of course, in order to recover the full amount of the bond, Grisoni is required to show that he suffered damages from the injunction in an amount equal to or greater than the amount of the bond. *Shanks*, 174 S.W.2d at 463. In this case the trial court, having found Wright liable for malicious prosecution, awarded Grisoni damages well in excess of $500,000.

Wright argues that the proof of Grisoni's alleged damages was too speculative to support an award of compensatory damages. The award of compensatory damages is reviewed with the presumption that it is correct and will only be set aside if the evidence preponderates against it or the trial court used the wrong measure of damages. *Beaty v. McGraw*, 15 S.W.3d 819, 829 (Tenn. Ct. App. 1998). The award of compensatory damages in this case was based on Grisoni's lost profits, an appropriate measure of damages. Moreover, while an award of compensatory damages must be based on reasonable certainty, it does not require mathematical certainty. *Id.* We find that the evidence supports an award of compensatory damages at least up to the amount of the injunction bond.

Wright also argues that Grisoni should not recover damages for the wrongful injunction because he did not oppose the entry of the temporary injunction order. Wright cites no Tennessee caselaw which directly supports this assertion, and this Court has not discovered any Tennessee cases on point. The case of *Southern Ry. Co. v. Pardue*, 131 S.W. 862 (Tenn. 1910), appears to be most analogous. In that case, the defendant landowner was enjoined from building a house on land which was claimed by the plaintiff railroad to be part of its right of way. *Id.* at 862. In response to railroad's claim, the landowner filed a cross-claim seeking a judicial determination of the rights of the parties in the disputed property. *Id.* at 863. Later the injunction was dissolved and the landowner sought to recover on the injunction bond. The landowner testified that, after he heard of the railroad's claim, he wanted the matter settled before building on the property. *Id.* The trial court concluded that the landowner chose to forbear from building on the property, and would have done so regardless of the injunction. *Id.* Therefore, only nominal damages were awarded under the injunction bond. *Id.* The case simply stands for the proposition that the damages must be caused

---

[19]As noted in the discussion of the proceedings in this case, at the time of the hearing to dissolve the injunction, the injunction bond was raised to $250,000. When the order dissolving the injunction was appealed, the appellate court stayed the order and raised the bond to $500,000. Thereafter, while an order was in effect staying the trial court proceedings, the trial court raised the bond to $2.4 million. However, because there was a stay in effect, this order was vacated. Grisoni appealed this order on the bond to the Tennessee Supreme Court; his petition was denied. The bond remained unchanged until the hearing on damages was concluded, after which the injunction was dissolved.

by the injunction, rather than a cause independent of the injunction. *See South Central Tenn. R.R. Auth.*, 44 S.W.3d at 921 (discussing *Southern Ry. Co. v. Pardue*).

In this case, there is no evidence that Grisoni's failure to further develop and market ProFusion was the result of anything other than the wrongfully issued injunction. The evidence does not indicate that Grisoni would have chosen not to market ProFusion in the absence of the injunction. Indeed, although Grisoni did not oppose entry of the temporary injunction, in all of the pleadings in the record, he steadfastly maintained that he had used no confidential information and that the injunction was not warranted. Simply consenting to a temporary injunction, to enable the parties to maintain the status quo while the lawsuit is pending, should not preclude the enjoined party from seeking damages under the injunction bond for a wrongful injunction.

Grisoni argues that he should be able to recover a penalty under Tennessee Code Annotated § 29-23-104,[20] sometimes referred to as the "penalty statute." Grisoni argues, without citing supporting authority, that such a penalty is appropriate where the enjoined party is unable to prove malicious prosecution. Further, Grisoni argues, the penalty is not limited by the amount of the injunction bond. Grisoni's argument is without merit. The statute is a mechanism for an award of a penalty in a situation in which the enjoined party's damages are too speculative to support an award of compensatory damages. Obviously, the trial court did not conclude that the evidence was too speculative to support an award of compensatory damages. The statute, therefore, has no application to the facts in this case.

Accordingly, we hold that Grisoni is entitled to recover as compensatory damages for the wrongful injunction the full amount of the injunction bond, $500,000. The trial court's award of compensatory damages is therefore modified to this amount.

## SURETY LIABILITY

Grisoni argues on appeal that Travelers should be liable for the full judgment, rather than the amount of its bond, $250,000, based on alleged ambiguity in the terms of Travelers' bond. The first paragraph sets Travelers' liability under the bond at $250,000. The second paragraph then provides that, "*if* said Principal or Surety pays *all* damages and costs which any person may sustain by the suing out of such Temporary Restraining Order if the same is dissolved, this obligation to be void." (emphasis added). Grisoni argues that the use of the word "all" in the paragraph creates an obligation on the part of Travelers to pay the entire judgment. However, the use of the word "if" in the second paragraph creates a condition which, if met, discharges the obligation created in the first paragraph. Traveler's liability as a surety is, therefore, limited to $250,000.

---

[20]Tenn. Code. Ann. § 29-23-104(a) (2000) provides:

> In cases where the court is of the opinion that the party enjoined has suffered a substantial injury, but that damages are speculative or incapable of ascertainment under legal rules, it may, on dissolution, in its sound discretion, assess and decree against the party suing out the writ a penalty in favor of the party enjoined.

Travelers asserts that the injunction bond has been discharged by the trial court's failure to enter a judgment against Travelers. Travelers also argues that the bond has been discharged by Wright's filing of an appeal bond. Travelers fails to offer any authority supporting these assertions. We find them without merit.

## ALLOMATRIX

Grisoni appeals the trial court's decision to not award damages for Wright's alleged misappropriation of material from Grisoni's lab notebook. Grisoni produced his lab notebook to Wright as part of Wright's discovery into Grisoni's alleged use of confidential information. Along with information relating to Grisoni's development of ProFusion, the notebook also contained information on Grisoni's research into a calcium sulfate based putty. Grisoni testified that, within a few months of gaining access to his lab notebook, Wright was able to develop its own calcium sulfate putty product, Allomatrix, using several of the same development parameters described in Grisoni's lab notebook. Grisoni argues that this evidence preponderates in favor of finding that Wright used Grisoni's proprietary information in developing Allomatrix. Despite finding nearly all credibility determinations in Grisoni's favor, the trial judge nevertheless could not find that Wright had developed Allomatrix by using information from Grisoni's lab notebook. We hold that the preponderance of the evidence supports the trial court's holding.

## CONCLUSION

In sum, we affirm the trial court's factual finding that Wright improperly accessed Grisoni's lab notebook, reverse as clearly erroneous the trial court's finding on the credibility of Wright's attorney, William Haltom, and hold that the evidence is not sufficient to find either malice or lack of probable cause. Consequently, the finding of malicious prosecution is reversed. Because the evidence is insufficient to support a finding of malice, the award of punitive damages is likewise reversed. Deferring to the trial court's determinations on the credibility of the witnesses, we hold that the evidence does not preponderate against the trial court's order dissolving the injunction. The award of compensatory damages to Grisoni for the wrongful injunction must be limited by the amount of the injunction bond. Therefore, the award of compensatory damages is modified to the amount of the bond, $500,000. We hold that Travelers may be held liable for the amount of the bond it executed, $250,000. We affirm the trial court's holding that Wright is not liable for utilizing information allegedly misappropriated from Grisoni to develop Allomatrix. The remaining issues raised on appeal are pretermitted.

The decision of the trial court is affirmed in part, reversed in part and modified as set forth above. Costs are divided equally among the parties, appellant, Wright Medical Technology, Inc., and its surety, and the appellees, Bernard F. Grisoni and Biogeneration, Inc., and appellee, Travelers Casualty and Surety Company of America, for which execution may issue if necessary.

_____
HOLLY KIRBY LILLARD, JUDGE