# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### October 27, 2009 Session

**DAVID M. SHARP v. DEBBIE F. STEVENSON, ET AL.**

**Direct Appeal from the Chancery Court for Obion County**
**No. 24,758      W. Michael Maloan, Chancellor**

---

**No. W2009-00096-COA-R3-CV - Filed March 10, 2010**

---

## DISSENT

---

HOLLY M. KIRBY, JUDGE, dissenting:

I must respectfully dissent in this case. Unfortunately, I find that I disagree with both the majority opinion and the concurrence.

First, I believe that the finding of the trial court below was necessarily based, at least in part, on its assessment of Mr. Sharp's credibility. Mr. Sharp claimed in his testimony that he was either uninformed or misled about whether the permanent parenting plan was an award of permanent custody to the Stevensons. The trial court found that he was neither. The majority states that Mr. Sharp's testimony was undisputed, but "the trier of fact is free to believe or disbelieve all or part or none of a witness'[s] testimony, even where the testimony is uncontradicted." *Cornell v. State of Tennessee*, 118 S.W.3d 374, 378 (Tenn. Ct. App. 2003). The trial court's determination of a witness's credibility is "binding on the appellate court unless from other real evidence the appellate court is compelled to conclude to the contrary." *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 585 (Tenn. Ct. App. 2001) (quoting *Hudson v. Capps*, 651 S.W.2d 243, 246 (Tenn. Ct. App. 1983)) (comparing witness's transcribed courtroom testimony with transcribed recorded conversation). The majority reverses the trial court's determination of Mr. Sharp's credibility, but cites no "real evidence" contradicting the trial court's finding.

Indeed, the record includes ample support for the trial court's finding that Mr. Sharp's claim was not believable. Prior to the dispute with the Stevensons, Mr. Sharp was involved in divorce proceedings with the children's mother. As a result, Mr. Sharp was named as the children's "primary residential parent" in their marital dissolution agreement. Certainly he would have understood from this experience that he had custody of his children. After Mr.

Sharp's conduct resulted in an award of temporary custody to the Stevensons in 2005, Mr. Sharp testified that two years of legal wrangling ensued, including attempts at mediation, letters back and forth, and numerous discussions. Mr. Sharp was represented by counsel during these lengthy negotiations, which resulted in his consent to the permanent parenting plan. Against this backdrop, Mr. Sharp asked the trial court to believe that he did not understand that the product of the mediation, letters and negotiations involved "custody." The trial court did not believe his assertion and the record supports its credibility determination.

Further, Mr. Sharp's testimony shows that he understood the effect of the permanent parenting plan. Referring to the permanent parenting plan, Mr. Sharp complained that "the Court order says that they [the Stevensons] have complete control," which is, of course, the effect of an award of custody. He understood that the permanent parenting plan was "binding." Mr. Sharp acknowledged that, before agreeing to the permanent parenting plan, he was advised that he could only ask the court to change the parenting order "based on a modification of circumstances." This is, in effect, the legal consequence of a valid order transferring custody to a non-parent: custody can be modified only when "a material change in circumstances has occurred." *Blair v. Badenhope*, 77 S.W.3d 137, 148 (Tenn. 2002). Thus, despite Mr. Sharp's protestations, his own testimony shows that he was fully advised about the consequences of his choice.[1]

The majority is troubled by the fact that Mr. Sharp and the Stevensons used a standard form for a permanent parenting plan for two divorced parents that had been modified to name the Stevensons, the grandparents, as the "primary residential parents." The concerns raised by the majority appear to be (1) the permanent parenting plan uses terminology such as "primary residential parent" and "parenting time" instead of more traditional terms, like "custodian" and "visitation"; (2) Mr. Sharp retained input into parenting decisions and parenting responsibilities when the children were with him; and (3) the permanent parenting plan does not state that Mr. Sharp waives his superior parental rights.

First, the language in the permanent parenting plan. Tennessee's legislature has recognized that the terminology used in family law cases, referring to "custody" of children, "custodial" and "non-custodial" parents, and the non-custodial parent's "visitation," was divisive, freighted with "negative win/lose connotations," and was ultimately not descriptive of the allocation of parenting responsibilities in a divorce. *See* JANET L. RICHARDS, RICHARDS ON TENNESSEE FAMILY LAW (2D ED.) § 8-2(e) at 184, and 2007 Cum. Supp. At § 8-2(e); Don L. Ash, *Bridge Over Troubled Water: Changing the Custody Law in Tennessee*,

---

[1]The fact that Mr. Sharp's motivation in agreeing to the parenting plan was to get more visitation with his children does not affect this conclusion.

27 U. MEM. L. REV.769, 804 (Summer 1997). Consequently, the legislature indicated that courts are to replace "custody" orders with "parenting plans," using language that is less divisive and more accurate in describing the roles of divorced parents. T.C.A. § 36-6-404 (2005). A parent who formerly would have been "awarded custody" would now be "designated as the child's primary residential parent." The former "non-custodial parent" is now the "alternate residential parent." "Visitation" is now "residential parenting time." This nomenclature recognizes that the "alternate residential parent" still retains parental rights and responsibilities, particularly when the child is in his care, and that the child has a second home with the alternate residential parent and is not just a "visitor."

Our appellate courts have been somewhat uneven in using the current terminology in opinions. For example, the court in **Blair v. Badenhope** used the term "custody" repeatedly in its decision. This uneven usage does not change the legal import of the language used in family law orders. A "permanent parenting plan" that "designates" the "primary residential parent" is still the equivalent of an order awarding permanent primary custody of the child.

The majority states: "A parenting plan is simply not the equivalent of a valid order awarding custody to a non-parent." Because the majority did not find that the order incorporating the parenting plan was invalid or void, I assume that this statement reflects concern that usage of "parenting plan" terminology in the context of an order with a non-parent, instead of between parents, may have confused Mr. Sharp.[2] The majority even goes so far as to state that "[t]here is nothing in the plan to suggest that Mr. Sharp agreed . . . to grant the Stevensons permanent custody." But the permanent parenting plan clearly designates the Stevensons as the primary residential parents. Mr. Sharp had had the same designation in a previous order with the children's mother and thus had to understand that the "primary residential parent" meant custody, and Mr. Sharp has not asserted that he did not understand the word "permanent."

The majority also notes that, under the permanent parenting plan, Mr. Sharp retained some parenting rights and responsibilities, such as the right to make decisions regarding the children's day-to-day care while they are with him, the right to discuss major decisions with the Stevensons, and the standard statutory rights. It notes that, under current standard parenting plans, the alternate residential parent

---

[2]I am concerned that the majority's reliance on the "parenting plan" terminology to support its decision will serve to destabilize existing agreed permanent parenting plans between parents. The majority's reasoning could certainly be relied upon by countless "alternative residential parents" to claim that they did not understand that the permanent parenting plan to which they agreed was in fact a custody order.

. . . is not relegated to a less-than-parent status. On the contrary, the current parenting plans, which are designed to fully describe each parent's rights and responsibilities as a full parent, preserve each parent's superior parental rights with respect to any claims which might be asserted by a non-parent.

That is certainly true. But the same can be said of the old-time "custody" order. Even the most one-sided "custody" order *between a child's parents* has never affected either parent's ability to assert his superior parental rights as against a non-parent.

Finally, the majority states: "There is nothing in the [permanent parenting] plan to suggest that Mr. Sharp agreed to relinquish his superior parental rights to the children." This portion of the majority's reasoning seems to coincide with Judge Stafford's concurrence, in that this prong of the majority's decision implies that there must be an express written waiver relinquishing the parent's superior parental right to custody of his child. Therefore, I will address this part of the majority decision at the same time that I respond to the concurrence.

In ***Blair v. Badenhope***, 77 S.W.3d 137 (Tenn. 2002), the Court held:

Presuming that a parent is afforded the opportunity to assert superior parental rights in the initial custody proceeding, then the parent's voluntary transfer of custody to a non-parent, *with knowledge of the consequences of that transfer*, effectively operates as a waiver of these fundamental parental rights. Under these circumstances, the Constitution does not again entitle the natural parents to assert superior parental rights to modify a valid custody order, even if no court has previously found the natural parent to be unfit.

***Id.*** at 147-48 (footnote omitted) (emphasis added). The ***Blair*** court did not indicate what was meant by "knowledge of the consequences" of voluntarily transferring custody to a non-parent.

In reaching its decision, the ***Blair*** court surveyed the law in other states regarding proceedings filed by a biological parent to modify a prior custody award to a nonparent. It was persuaded by the majority view in other states that "the voluntary relinquishment of indefinite custody to a non-parent" is "conduct that [is] inconsistent with the parent's constitutionally protected rights." ***Blair***, 77 S.W.3d at 146. The majority of other states saw

such a decision as a "forfeiture" of the parent's superior right to custody.[3]  *Id.* at 147.  The *Blair* court emphasized:

> *Having once protected the parent's rights to custody, at the risk of sacrificing the child's best interests, we should not then sacrifice the child's need for stability in its care and living arrangements by modifying those arrangements more readily than in a parent-parent case.*

*Id.* at 145 (quoting *C.R.B. v. C.C.*, P.2d 375, 380 (Alaska 1998) (emphasis by *Blair* court)).  Thus, the *Blair* court carefully balanced protection of the parent's superior right to custody against the child's need for nurturing and stable care.

The Supreme Court applied *Blair* in *In re: A.M.H.*, 215 S.W.3d 793 (Tenn. 2007).  In *A.M.H.*, the Court stated that it was required to address the consent order transferring custody to non-parents because, "[u]nless we conclude that the consent order is unenforceable, the parents of A.M.H. have no superior rights to the custody of A.M.H." *Id.* at 811.  The *A.M.H.* Court then stated that it was applying and interpreting the phrase in *Blair* that the majority interprets in the instant case:

> Recognizing the possibility that in the informal setting of juvenile court unrepresented parents could enter into a formal order without understanding the actual effect of transferring custody, we have explained that it is only a parent's "voluntary transfer of custody to a non-parent, *with knowledge of the consequences of that transfer*," that will defeat a parent's claim to superior rights of custody. [*Blair*, 77 S.W.3d] at 147 (emphasis added).

*Id.* (emphasis in *A.M.H.*).  The *A.M.H.* Court also quoted the language in *Blair*, relied upon by the majority herein:

> As we stated in *Blair*:
>
> > Where a natural parent voluntarily relinquishes custody without knowledge of the effect of that act, then it cannot be said that these rights [to the care and custody of one's child] were

---

[3]The *Blair* court chose not to follow other states that apply the parental preference in *all* custody proceedings, whether they are initial proceedings or proceedings to modify, and also eschewed the small minority of courts that apply a best interest test in all circumstances, including an initial custody proceeding between a parent and a non-parent. *See Guinta v. Doxtator*, 20 A.D.3d 47, 52, 794 N.Y.2d 516, 520 (N.Y. App. 2005).

accorded the protection demanded by the Constitution. As such, application of the superior rights doctrine in a subsequent modification proceeding would be justified.

*Blair*, 77 S.W.3d at 148 n.3.

*Id.* at 812 (bracketed language added in *A.M.H.*). Applying *Blair*, the *A.M.H.* Court then considered the biological parents' evidence that, at the time of the initial custody order, they were told that the order was temporary and that their later request for return of custody would be refused only if they engaged in misconduct such as substance abuse. *Id.* The *A.M.H.* Court found that this evidence established that the parents' transfer of custody was not done "with knowledge of the consequences." *Id.*

Thus, the *A.M.H.* Court initially recognized that, unless the consent custody order was unenforceable, the parents would be deemed to have waived their superior right to custody of their child. *Id.* at 811. At no point did the Supreme Court in *A.M.H.* indicate that the burden was on the petitioner Bakers to show that the biological parents were informed of their superior parental rights or that they expressly waived them in executing the consent order on custody. This is consistent with the *Blair* court's description of a parent's voluntary relinquishment of permanent custody to a non-parent as a "forfeiture" of the parent's superior right to custody. *Blair*, 77 S.W.3d at 147. The act itself is "conduct that [is] inconsistent with" a parent's assertion that he intended to retain the superior right to custody in the future. *Id.* at 146. Thus, the order transferring custody to the non-parent need not go on to state expressly that the parents agree to relinquish their superior rights to custody of their children.

As shown in *A.M.H.*, however, the biological parent is not foreclosed from asserting his superior right to custody if he can show that he entered into the consent order transferring custody without "knowledge of the consequences of that transfer." *A.M.H.*, 215 S.W.3d at 811 (quoting *Blair*, 77 S.W.3d at 147). In *A.M.H.*, the biological parents submitted affirmative evidence that, despite the language in the consent order transferring custody, they were told that the transfer of custody was temporary and that, absent misconduct on their part, they could regain custody in the future if they chose to do so. This evidence from the parents showed that their voluntary relinquishment of custody was done without "knowledge of the consequences." Thus, they were permitted to assert their superior right to custody in the subsequent modification proceedings. *Id.* at 811-12.

Consistent with the Supreme Court's application of *Blair* in *A.M.H.*, I would hold that, absent other evidence, once biological parents agree to a valid consent order transferring custody of the child to a non-parent, thereafter, the parents "have no superior rights to the custody of" their child. *A.M.H.*, 215 S.W.3d at 811. The parents, however, have the

opportunity to show that, when they agreed to relinquish custody, they did not have knowledge of the consequences of their decision. If they can carry the burden of proving that they did not have such knowledge, then they can assert their superior right to custody in the modification proceedings. *Id.* at 811-12. This can be done, as in *A.M.H.*, by showing that the parents were told that the order was temporary, or that they were told that they would not have to show a material change in circumstances in order to regain custody.

In the instant case, the majority does not disagree with the trial court's holding that the permanent parenting plan under which the Stevensons received custody is a valid custody order. The concurrence states explicitly that it is a valid, final order. Despite Mr. Sharp's assertions to the contrary, the trial court found that the order clearly shows that the order is not temporary, but is a final, permanent award of custody to the Stevensons, and that Mr. Sharp, represented by counsel at the time, knew that the order was final and permanent when he consented to it.

Moreover, there is no indication that Mr. Sharp's superior right to custody was not fully protected in the initial custody proceeding. Mr. Sharp does not contend that, at the time he entered into the consent order, he was not aware that he, as the child's biological parent, had a superior right to custody of his child. Knowing that he had a superior right to custody, Mr. Sharp *voluntarily forfeited* custody to the Stevensons – not temporary custody, *permanent* custody. This act is inherently inconsistent with Mr. Sharp's claim that he believed he was retaining his superior right to custody in the future.

As in *A.M.H.*, Mr. Sharp had the opportunity to produce evidence that he was told something contrary to the plain language of the initial custody order, *i.e.*, he was told that the order was temporary or that he would be permitted to assert his superior right to custody in the future. He did not do so. Thus, Mr. Sharp produced no evidence that he did not have "knowledge of the consequences of [the] transfer" of custody to the Stevensons. *Blair*, 77 S.W.3d at 147. Under *A.M.H.*, then, Mr. Sharp no longer has superior rights to the custody of the child.

The concurrence in this case would go even further from the Supreme Court's holdings in *Blair* and *A.M.H.* The concurrence would hold that a non-parent who has permanent custody of a child pursuant to a valid consent order, when faced with a petition to modify custody, must prove *by clear and convincing evidence* that, when the biological parent entered into the consent order, he specifically waived his right to assert his superior right to custody in future proceedings. This is clearly an extension of *Blair*.

The only cases cited by the concurrence in support of its approach are two Kentucky cases whose facts are so different from the case at bar that they must be considered

inapposite. In ***Greathouse v. Shreve***, 891 S.W.2d 387 (Ky. 1995), the child's parents never married and initially lived with the child's maternal grandmother. While the child was still an infant, the father moved out, and later the mother departed as well, leaving the child in the grandmother's care. ***Id.*** at 388.

After several years, the father established his paternity. The grandmother then filed an action to adopt the child and terminate the parental rights of both parents. This claim was later dropped, and the maternal grandmother joined forces with the mother in filing a petition for joint custody, to the exclusion of the father. ***Id.*** However, the mother lived out of state, and it became apparent that she was merely a shill, a device to permit the grandmother to obtain legal custody and exclude the father. ***Id.*** at 388, 390. Nevertheless, because the mother sought custody jointly with the grandmother, the trial court employed a "best interests" analysis and granted the request for joint custody to the mother and grandmother. ***Id.*** at 389.

The father appealed to the intermediate appellate court. The intermediate appellate court affirmed the award of custody, without addressing the portion of the order that awarded joint custody to the mother. ***Id.*** Instead, it found that the father, by leaving the child in the grandmother's care, had waived his superior parental right to custody because he "surrendered the care and custody of the child to another" and "acquiesced in the child's remaining there for an extended period of time." ***Id.*** at 389. The intermediate appellate court then applied a best interests analysis and affirmed the award of custody to the grandmother. ***Id.***

The father appealed again. The Kentucky Supreme Court found that joining the mother in the grandmother's petition for custody as a basis for applying the best interests test "was a purely technical device, a method for evading the natural father's superior claim to custody." ***Id.*** at 390. It also disagreed with the intermediate appellate court's application of the waiver principle. It noted the father's assertion that, for several years, "he did not realize he had any right to his son because of the fact that he and the child's mother were never married." ***Id.*** The Kentucky Supreme Court said that, under the facts of that case, the trial court needed to make factual findings on the issue of waiver, observing that the father's long term acquiescence in the living arrangement was a factor to be considered, but was not conclusive. ***Id.*** Therefore, the ***Greathouse*** Court remanded the case to the trial court for factual findings.[4]

_____

[4]In its analysis, the ***Greathouse*** Court cites ***Boatwright v. Walker***, 715 S.W.2d 237 (Ky. Ct. App. 1986); ***Greathouse***, 891 S.W.2d at 391. In ***Boatwright***, the Court noted that a parent's superior right to the care and custody of his child can be "contracted away" by executing "an agreement of a permanent

(continued...)

-8-

*Greathouse*, then, is distinguishable from the case at bar in numerous important respects. Unlike the instant case, *Greathouse* involved the *first* proceeding regarding the custody of the child. Moreover, the proceedings in *Greathouse* were complicated by the mother's participation in the grandmother's petition for custody. In contrast to the instant case, the Kentucky intermediate appellate court did not find waiver of the father's superior right from his voluntary consent to an order awarding permanent custody, but rather from the father's act of leaving the child in the grandmother's care at a time when the father did not have legal counsel and was not aware of his superior parental right. Thus, *Greathouse* involves the protection of the parent's superior right *in the first instance*. Of course, "parents in the initial proceedings enjoy a strong presumption that they are entitled to the physical custody of their children." *Blair*, 77 S.W.3d at 146. In the instant case, Mr. Sharp's superior parental rights were fully protected in the first proceeding. Unlike *Greathouse*, Mr. Sharp now seeks to modify the permanent custody order to which he consented, with full benefit of counsel. Clearly, *Greathouse* is wholly inapplicable.

As to the second Kentucky case cited by the concurrence, although it indeed cites *Greathouse*, it does not support the approach advocated by the concurrence. In *Mullins v. Picklesimer*, 2010 WL 246063 (Ky. 2010), a biological mother and her same-sex partner executed a consent order awarding the non-biological parent custody rights. After the partners ceased living together, legal proceedings regarding the child's custody ensued. *Id.* at *2. The prior agreed custody order was invalidated on the basis of fraud. *Id.* at *6. The *Mullins* Court held that, even though the child was never separated from the biological parent, and even though the biological parent was not represented by counsel when she executed the now-invalidated consent custody order, her execution of the consent order was "as absolute waiver of part of her superior custody rights as the natural parent of the child." *Id.* at *8, *10. In so holding, the *Mullins* Court relied on a North Carolina case that "couched its analysis in terms of whether the natural parent had acted in a manner inconsistent with her constitutionally protected status as a natural parent." *Id* at *9 (citing *Heatzig v. MacLean*, 664 S.E.2sd 347, 350-51 (N.D. Ct. App. 2008)). The *Mullins* Court found that the biological parent's act of setting up a family unit with the partner and executing a custody agreement constituted "clear and convincing evidence" that she "waived her superior custody rights" to the child. *Id.* at *10.

Indeed, neither Kentucky case indicates that the biological parent must have *expressly* waived his or her superior parental right in order to make a factual finding of waiver. Rather,

_____

[4](...continued)
nature," such as a consent for adoption. In such a case, once such a contract has been executed, even if consent is later withdrawn, "the natural parent has waived its superior right, and the best interests of the child take precedence." *Boatwright*, 715 S.W.2d at 244.

both of the Kentucky cases focus on whether the biological parent's actions were inconsistent with his or her protected status. Thus, the Kentucky cases cited by the concurrence do not support the approach advocated in the concurrence. The concurrence points to no other case in *any* jurisdiction that goes so far.

The concurrence claims that, under the standard it advocates, "no formal or written waiver is required." This is wishful thinking. Absent a "formal or written waiver," how can the child's custodian prove the parent's knowledge at the time of the initial custody order? The evidence proffered by Mr. Sharp in this case is a prime example. The information Mr. Sharp says that he was given at the time he entered into the agreed permanent parenting plan was correct.[5] He seeks to now vitiate the agreed permanent parenting plan based only on his claimed presumption, articulated to no one at the time, that he would retain his superior right to custody. As found by the trial court, the understanding now claimed by Mr. Sharp is at odds with the language in the agreed permanent parenting plan and with his unequivocal act of relinquishing permanent custody.

Under the standard advocated by the concurrence, even if the biological parent's superior right to custody is fully protected in the initial proceeding and the order giving custody to a non-parent is valid, final and permanent, the child's custodian must in effect prove by clear and convincing evidence that the parent made an additional promise not to assert his superior right to custody in the future. This holding effectively transforms Tennessee into a jurisdiction in which "the parental preference [is applied] in all custody proceedings, whether they are initial proceedings or proceedings to modify prior orders." *Guinta v. Doxtator*, 20 A.D.3d 47, 52, 794 N.Y.2d 516, 520 (N.Y. App. 2005). This approach was specifically rejected in *Blair*, inasmuch as it "would effectively render existing orders of custody to non-parents practically worthless." *Blair*, 77 S.W.3d at 149.

The Supreme Court in *Blair* carefully balanced protection of the parent's superior right to custody against the child's need for permanency and stability. Mr. Sharp's constitutional superior right to custody of his child was fully protected in all of the proceedings leading up to the permanent order, and he nevertheless chose to relinquish custody permanently. As emphasized in *Blair*, at this point we should protect "the interests of the child in a stable and secure environment." *Blair*, 77 S.W.3d at 149.

---

[5]Mr. Sharp claims that his attorney at the time assured him that he was not giving up his parental rights. This is, of course, correct. Mr. Sharp to this day retains his parental rights. His parental rights are separate and distinct from his superior right to custody of his child.

I would affirm the decision of the trial court.  Therefore, I respectfully dissent.


                                   _____

                                   HOLLY M. KIRBY, JUDGE